# EXHIBIT H

PART 1 of 3

FILED
AUG 15 2002

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

Civil File No: CIV02-3030

SUN PRAIRIE, A PARTNERSHIP, and BELL FARMS, LLP, A Nebraska Limited Liability Partnership,

Plaintiffs

vs.

NEAL McCALEB, Assistant Secretary - Indian Affairs, Department of the Interior, in his official capacity; and GAIL NORTON, Secretary of the Department of the Interior, in her official capacity; and ROSEBUD SIOUX TRIBE, a federally recognized tribe.

Defendants,

**COMPLAINT**

---

COMES NOW THE PLAINTIFFS Sun Prairie, A Partnership ("Sun Prairie"), a Nebraska general partnership, and Bell Farms, LLP ("Bell Farms"), a North Dakota limited liability partnership, by and through their undersigned attorneys, and for their causes of action against the Defendants, state and allege as follows:

**INTRODUCTION**

In this action, the Plaintiffs Sun Prairie and Bell Farms seek declaratory and injunctive relief against the defendants Neal McCaleb and Gale Norton (the "Federal Defendants"), in their official capacities, and the Rosebud Sioux Tribe (the "Tribe"), and also seek adjudication of supplemental claims against the Tribe.

**PARTIES**

1. Plaintiff Sun Prairie is a Nebraska general partnership that operates hog production farms in Nebraska and North Dakota. Plaintiff Bell Farms is a North Dakota limited liability partnership that has a management contract with Sun Prairie to manage the hog farms at issue in this litigation, that are located on the Rosebud Sioux Indian Reservation (the "Reservation") near Rosebud, South Dakota.

2. Defendant Neal McCaleb ("McCaleb") is sued in his official capacity as Assistant Secretary - Indian Affairs within the United States Department of the Interior. McCaleb is successor in this office to former Assistant Secretary - Indian Affairs Kevin Gover. The Assistant Secretary - Indian Affairs has responsibility over the management of the Bureau of Indian Affairs ("BIA").

3. Defendant Gale Norton ("Norton") is sued in her official capacity as Secretary of the Interior within the United States Department of the Interior. Norton is the successor in this office to former Secretary of the Interior Bruce Babbitt. The Secretary of the Interior has responsibility for management of the Department of the Interior's constituent agencies and bureaus, including the BIA.

4. Defendant Rosebud Sioux Tribe (the "Tribe") is a federally recognized Indian Tribe organized pursuant to Sections 16 and 17 of the Indian Reorganization Act of 1934 and all pertinent amendments, with its headquarters at Rosebud, Todd County, South Dakota.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367 and 2201-02.

6. Venue is proper in the District Court for the District of South Dakota under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### I. General Background

7. The Rosebud Sioux Tribe was represented by, among others, President Norman G. Wilson during the negotiations, execution and approval of the Land Lease by the Bureau of Indian Affairs in 1998 and until the tribal election in October 1999. After that tribal election, the Rosebud Sioux Tribe has been represented by President William Kindle.

8. At the time the Land Lease was negotiated, executed and approved, Larry Burr was the Superintendent of the Rosebud Agency ("Superintendent Burr") within the BIA, which has day-to-day supervision over activities under the authority of the BIA on the Reservation and Rosebud tribal trust land, title to which is held by the Federal Government. Superintendent Burr still holds this position.

9. At all times relevant to these proceedings, Cora L. Jones ("Regional Director Jones") was and is the Regional Director of the Great Plains Regional Office of the BIA, which office exercises supervisory authority over land leasing matters on the Reservation.

10. Kevin Gover was the Assistant Secretary - Indian Affairs for the United States Department of the Interior whose conduct forms part of the basis for the claims asserted herein. Mr. Gover was succeeded in office first by James McDivitt as interim Assistant Secretary - Indian Affairs, and next by Mr. McCaleb, the current Assistant Secretary - Indian Affairs.

### II. Solicitation And Approval of Land Lease

11. The Rosebud Sioux Tribe invited Sun Prairie in 1998 to discuss the development of pork production farms on the Reservation or tribal trust land located nearby in Mellette County

(collectively referred to herein as "Rosebud"). On information and belief, Rosebud, located in southwestern South Dakota, is among the poorest areas of the country and has long been unable to attract significant economic development or generate sufficient jobs for tribal members.

12. The Tribe and Sun Prairie signed a letter of intent relating to design, construction and management of the pork production facilities ("the Project") on or about April 1998. Pursuant to this letter of intent, Sun Prairie agreed to construct the physical facilities and secure financing for the Project. Bell Farms agreed to provide management expertise, and the Tribe agreed to lease the land to Sun Prairie and provide water for the Project.

13. Under the letter of intent, Sun Prairie would assume all risk of losses and, after a management fee was paid to Bell Farms, all profits would be divided 75 percent to Sun Prairie and 25 percent to the Tribe.

14. The Tribe and Sun Prairie subsequently negotiated a 15-year lease (the "Land Lease") for construction and operation of thirteen pork production facilities on land held in trust for the Tribe. The Project, at full operation, would be funded by more than $100 million in private investment without any government subsidy and would be staffed by approximately 225 employees.

15. Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370d, Superintendent Burr, among other things, conducted an Environmental Assessment ("EA") for the Project, circulated the document for comments, consulted with environmental professionals, and conducted a public hearing. Superintendent Burr, after completing the environmental review, subsequently issued a Finding of No Significant Environmental Impact ("FONSI") in accordance with BIA's NEPA requirements on August 14, 1998.

16. The Rosebud Tribal Council approved the Land Lease with Sun Prairie on August 19, 1998, and President Wilson and Rich Bell executed the Land Lease on September 8, 1998. Sun Prairie executed a management agreement with Bell Farms to assist in operation of the Project pursuant to the Land Lease. See Ex. 1 (Land Lease). Sun Prairie executed a management agreement with Bell Farms to assist in operation of the Project pursuant to the Land Lease in 1998.

17. The BIA approved the Land Lease on September 16, 1998, pursuant to 25 U.S.C. §§ 1(a), 81 and 415. No party filed an administrative appeal, and the BIA's approval became final 30 days after the date of approval.

**III. Site 1 Construction And Injunction**

18. In reliance upon the execution of the Land Lease and the subsequent BIA final approval, Plaintiffs commenced construction of the Project.

19. Certain opponents of the Project (the "Intervenors"), who had participated in BIA's EA process but had not appealed from the BIA's FONSI or Land Lease approval, filed a lawsuit in United States District Court for the District of Columbia in November 1998 (the "DC Lawsuit"), naming Assistant Secretary Gover and Interior Secretary Babbitt as defendants. In the lawsuit, the Intervenors sought to enjoin the Project based on alleged deficiencies in the environmental review, among other things. Neither Sun Prairie nor Bell Farms were named as parties to the DC Lawsuit.

20. On or about January 25, 1999, the United States Environmental Protection Agency ("EPA"), after reviewing the Project in conjunction with representatives of the BIA, the Tribe, and Sun Prairie, issued a letter finding that: (1) the finishing farm design for the Project called for no-discharge facilities that would require an EPA Permit; (2) the facilities, built as designed, would meet or exceed substantive federal environmental protection requirements; and (3) the

Project included state-of-the-art design features. Prior to this letter, BIA's independent environmental expert also studied the Project and issued reports finding that the Project would meet or exceed all applicable environmental standards for similar facilities.

21. The Federal Defendants filed an answer in the DC Lawsuit on January 26, 1999, denying all material allegations and specifically denying that there were any deficiencies in the EA conducted by Superintendent Burr or the FONSI that the agency ultimately issued. One day after filing this answer in the DC Lawsuit (and approximately four months after construction on Site 1 had begun and the time for any administrative appeals had expired), Assistant Secretary Gover issued a one-page letter (the "Gover letter") purporting to rescind Regional Director Jones' approval of the Land Lease, citing alleged deficiencies in the environmental review. At that time, the Tribe and Sun Prairie had substantially completed construction of the first farm, and the first hogs were scheduled for delivery to the farm within less than one month.

22. The DC Lawsuit was dismissed by stipulation of the parties to the action on January 29, 1999, three days after issuance of the Gover letter.

23. Sun Prairie and the Tribe jointly filed a Verified Complaint against the Federal Defendants in the District of South Dakota (the "South Dakota Lawsuit") on February 3, 1999, and Sun Prairie secured, after a full evidentiary trial, a permanent injunction prohibiting the Federal Defendants and the Intervenors from interfering with the hog farm construction and operation. See Rosebud Sioux Tribe et al. vs. Gover et al., Case No. CIV 99-3003 (February 3, 2000 Order). No party sought a stay of the permanent injunction. The Federal Defendants and the Intervenors appealed the Court's permanent injunction decision to the United States Court of Appeals for the Eighth Circuit. No party sought a stay pending appeal.

24. Plaintiffs completed construction the first finishing farm in 1999 at a cost of approximately $10 million. Construction of Site 1, known as the Grassy Knoll farm, employed more than 200 workers, mostly tribal members. Operation of the Grassy Knoll farm now requires approximately 20 employees, most of whom are tribal members.

25. As the result of a tribal election in October 1999 that changed the membership of the Rosebud Sioux Tribal Council and brought Tribal President Kindle into power, the Tribe moved to realign from a plaintiff to a defendant in the South Dakota Lawsuit while the permanent injunction was on appeal. The Rosebud Sioux Tribal Council resolution authorizing this request, which was submitted to the Eighth Circuit Court of Appeals with the motion, expressly confirmed the Tribe's wish to "realign itself *as a defendant/appellant*." (emphasis added). The Court of Appeals granted that motion on August 28, 2000.

**IV. <u>Site 2 Construction</u>**

26. After the District Court issued a permanent injunction in 2001, Plaintiffs commenced planning and construction of the second site ("Site 2" or "Cottonwood Grove") at the Project as contemplated and authorized under the Land Lease, the authority of which was affirmed in the permanent injunction order from which no party had sought a stay pending appeal. As the Plaintiffs began work on the Cottonwood Grove farm, the Tribe began an escalating pattern of conduct to interfere with and delay the construction and operation of the Project.

27. The Tribe refused to provide water as promised in the initial Project agreements and attempted to prevent Plaintiffs from securing an alternate arrangement to obtain water from a private well by purportedly enacting permit and fee requirements that applied only to Sun Prairie.

28. The Tribe repeatedly refused to review design plans submitted by Sun Prairie for Site 2 despite being presented with them on three different occasions: September 22, 2000, November 6, 2000, and April 9, 2001.

29. Thereafter, the Tribe made no substantive suggestions, revisions, or modifications to the Site 2 plans, or indicated to Sun Prairie when, if ever, it would act on the plans.

30. On information and belief, the Tribal Council and/or President Kindle instructed tribal officials in approximately May 2001 to stop processing Sun Prairie's applications for certification under the Tribal Employment and Contracting Rights Ordinance ("TECRO"), which applications were necessary for construction of Site 2 and operation of the Project.

31. On information and belief, the tribal environmental officers, on President Kindle's orders, refused beginning in or about the Fall of 2002 to participate in meetings with the BIA, the EPA and Sun Prairie to review the environmental control measures and sampling data applicable to the Project, including the Site 1 manure digester performance, about which the Tribe had publicly complained was not functioning properly.

32. On information and belief, the Tribe, while professing to be eager to regulate and oversee the Project, failed on repeated occasions to conduct various sampling and monitoring activities that it was either required or entitled to conduct under the Land Lease, including sampling that assists in determining whether the Site 1 manure digester is performing as designed.

33. On information and belief, the Tribe, at President Kindle's demand, issued a stop-work order for Site 2 under its TECRO ordinance on April 18, 2001, despite the fact that TECRO officials admitted that Sun Prairie is and has always been in compliance with the TECRO ordinance with respect to construction of the Cottonwood Grove farm.

34. The Tribe, relying on a verified complaint signed by President Kindle and without any advance notice to Sun Prairie, secured an *ex parte* temporary restraining order from the Rosebud Sioux Tribal Court to halt Site 2 construction on April 24, 2001, at the same time that the Tribe was asking Sun Prairie to meet and confer regarding the stop-work order issued under the TECRO ordinance.

35. On information and belief, the assertion of Tribal Court jurisdiction to circumvent the permanent injunction was contrary to the District Court's orders of February 3, 2000, and April 10, 2000, and also contrary to federal law.

36. Sun Prairie filed a motion for a show cause order with the District Court in the South Dakota Litigation on April 27, 2001. After a full hearing, at which the Federal Defendants and Intervenors were heard as well as the Tribe, the Court issued an order confirming that the permanent injunction applied to the Tribe, and prohibiting any further conduct in violation of the injunction. See Rosebud Sioux Tribe et al. vs. Gover et al., Case No. CIV 99-3003 (May 18, 2001 Order).

37. At the hearing, the evidence revealed that tribal officials from the Tribe's Water Resources and TECRO offices were instructed by President Kindle and the Tribal Council not to review or process Sun Prairie filings so as to obstruct completion of the Cottonwood Grove farm and disrupt operations of the Project.

38. The evidence at the hearing further showed that tribal officials were presented *three times* with design plans for Site 2, the first occurrence dating back to September 2000, and that tribal officials received (and ignored) repeated communications, both written and oral, from Sun Prairie concerning construction of Site 2 for more than nine months before Sun Prairie

commenced work. This evidence refuted the Tribe's claim that it had not been allowed to review the Cottonwood Grove plans.

39. The evidence at the hearing further showed that the manure digester at the Grassy Knoll farm was functioning in compliance with applicable regulatory standards, and that the Tribe's claims to the contrary were unsupported by any test data or other reliable information.

40. The District Court rejected the Tribe's only evidence on the digester operations -- the testimony of its Director of Water Resources -- as not credible. The Director conceded during the hearing that he lacked the technical training and experience to make judgments about the design or operation of the waste system.

41. The District Court also found that the Tribe, through its purported regulatory actions and resort to tribal court, had acted in bad faith to obstruct the Project.

42. Pursuant to the District Court's May 18, 2001 Order, Sun Prairie resumed construction of the Cottonwood Grove farm, employing more than 100 workers, the majority of whom are tribal members, during development. Approximately 20 employees now work at the Cottonwood Grove farm.

43. Without reaching the merits, the Court of Appeals for the Eighth Circuit found on April 5, 2002, that Sun Prairie lacked standing to bring a claim under the 5 U.S.C. §§ 701-06, Administrative Procedure Act, because it lacked prudential standing under 25 U.S.C. §§ 81, 415, 42 U.S.C. §§ 4321-4371d, and 16 U.S.C. § 470-1(5).

44. Sun Prairie has secured approximately $40 million in outstanding financing from a bank consortium to construct and operate the Grassy Knoll and Cottonwood Grove farms. The loans are secured in part by leasehold mortgages held by the banks on the land leased by the Tribe for the farms. Sun Prairie also has an outstanding balance in excess of $5 million on subordinated

debt secured primarily from individuals in connection with its facilities, including the Rosebud farms and operations.

45. The Federal Defendants' and Tribe's conduct has placed Sun Prairie at risk of default on the Rosebud Project term and operating loans totaling approximately $40 million, on more than $5 million in subordinated debt, and on various cross-collateralized loans.

46. Sun Prairie is obligated by contract to purchase all of the pigs farrowed by a Colorado weanling pig grower at said grower's five sow farms in Colorado. The estimated annual production capacity of said Colorado sow farms is approximately 525,000 pigs per year, of which approximately 96,000 of those pigs are finished by Sun Prairie at its two farms operating at Rosebud.

47. On information and belief, if Sun Prairie were precluded from operating its Rosebud farms, it would lack sufficient facilities to finish all the pigs it is required to purchase from the above-referenced Colorado sow farms, and it would be unable to satisfy fully its contractual commitments to the Colorado Grower operating said sow farms.

48. Sun Prairie is obligated by contract with a packing company to delivery approximately 525,000 finished slaughter hogs per year to a packing company that processes said hogs, and Sun Prairie satisfies this contractual commitment through, among other facilities, its farms at Rosebud.

49. On information and belief, if Sun Prairie were precluded from operating its Rosebud farms, it would be unable to finish sufficient hogs to satisfy fully its contractual commitments to the above-referenced packing company to which it has made commitments to sell approximately 525,000 hogs each year.

50. In addition, the conduct of the Tribe and Federal Defendants during construction of the Grassy Knoll and Cottonwood Grove farms and thereafter caused unnecessary delay in completing construction and has caused increased construction and operating costs and lost profits.

51. The Federal Defendants' and the Tribe's conduct has caused uncertainty, has harmed Sun Prairie's ability to complete the full Project as described and anticipated in the Land Lease, and has damaged Sun Prairie's business goodwill.

52. In sum, the Defendants' conduct has caused irreparable harm to Sun Prairie's ability to contract, finance and conduct its operations.

53. The Land Lease, to which the Tribe is a signatory, entitles Sun Prairie to remain in possession during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of the Lease.

54. The Land Lease also states in its Savings Clause that if any term of the Lease is found to be unenforceable, the Lease shall automatically be amended to conform to the applicable decision. The Tribe agreed in the Land Lease to execute *any amendment necessary* to effectuate the goals and purposes of the lease. See Exhibit 1 (Land Lease) (emphasis added).

55. Without prejudice to its rights, Sun Prairie has offered to amend the Land Lease to reduce the size and scope of the Project and to address other matters raised by the Tribe. Tribal President Kindle and the Tribal Council have refused to discuss these proposed amendments.

56. On information and belief, Tribal President Kindle advised persons working for Sun Prairie on or about May 27, 2002, that the Tribe would be "taking over" Sun Prairie's operations at the Project and that Sun Prairie and Bell Farms would be "removed" by the Tribe from the Project.

57. On information and belief, tribal representatives on more than one occasion have informed Sun Prairie of the Tribe's threat to immediately discontinue water and utility services to the Project and to deny Sun Prairie access to the Rosebud farms in light of the Eight Circuit's decision of April 5, 2002.

58. On information and belief, BIA representatives have stated that the Land Lease is ineffective and that the BIA will not act to resolve the dispute notwithstanding the Bureau's obligation under 25 C.F.R. Part 162 to administer leases of reservation lands.

**COUNT ONE**
**(Declaratory Judgment, 28 U.S.C. § 2201)**

59. Plaintiffs restate and reallege Paragraphs 1 through 58 of their Complaint.

60. Sun Prairie has a protected property interest and entitlement in the Land Lease executed by the Tribe and approved by BIA Regional Director Jones, the property subject to the Land Lease, and the facilities and improvements that it has constructed at Rosebud pursuant to Land Lease.

61. The Federal Defendants' conduct purporting to rescind the Land Lease occurred without notice to Sun Prairie, without giving Sun Prairie an opportunity to be heard, and without meeting the requirements of applicable federal laws and regulations.

62. As a direct and proximate result of the Federal Defendants' conduct, the Plaintiffs have suffered damages including but not limited the deprivation of Sun Prairie's farming operation and its interests in the Land Lease and property subject thereto without due process of law.

63. Plaintiff Sun Prairie is entitled to a declaration that the Federal Defendants' conduct violates the procedural Due Process guarantees of the Constitution.

**COUNT TWO**
**(Declaratory Judgment, 28 U.S.C. § 2201)**

64. Plaintiffs restate and reallege Paragraphs 1 through 58 of their Complaint.

65. Plaintiff Sun Prairie has a protected property interest and entitlement in the Land Lease executed by the Tribe and approved by Regional Director Jones and the property subject thereto.

66. The Federal Defendants purportedly rescinded the Land Lease to settle the Federal Government's pending DC Lawsuit after the time for appeal of BIA's approval of the Land Lease had expired, after Sun Prairie had reasonably relied upon the Land Lease approval and committed millions of dollars, and without any proper notice to Sun Prairie or an opportunity to be heard.

67. As a direct and proximate result of the Federal Defendants' conduct, Plaintiffs have been damaged, among other ways, as follows: Sun Prairie has been deprived of its expectation and right to the finality of government action and its right to protection from arbitrary, oppressive and self-serving governmental conduct consistent with the guarantees of substantive Due Process.

68. Plaintiffs are entitled to a declaration that the Federal Defendants' conduct constitutes an impermissible government interference with their fundamental rights and liberty interests.

**COUNT THREE**
**(Due Process Impairment of Contract)**

69. Plaintiffs restate and reallege paragraphs 1 through 58 of their Complaint.

70. The Federal Defendants are parties to the Tribe's Land Lease with Sun Prairie pursuant to their statutory oversight, regulatory and enforcement obligations and are a signatory thereto.

71. The Federal Defendants' purportedly rescinded the Land Lease, depriving Sun Prairie of its rights and entitlements under the Land Lease without proper notice and an opportunity for a hearing.

72. The Federal Defendants' conduct violates the Fifth Amendment of the United States Constitution by impairing the obligation of contracts to which it is a party.

73. Plaintiff Sun Prairie is entitled to a declaration that the Federal Defendants' conduct violates the Due Process Clause by impairing the parties' Land Lease obligations.

**COUNT FOUR**
**(Due Process Impairment of Contract)**

74. Plaintiffs restate and reallege Paragraphs 1 through 58 of their Complaint.

75. Plaintiff Bell Farms has an agreement with Plaintiff Sun Prairie to provide management and other services in connection with the Project as allowed and contemplated by the Land Lease to which the Federal Defendants are a signatory to and are parties to pursuant to the Federal Defendants' statutory oversight, regulatory and enforcement authority.

76. The Federal Defendants have knowledge of the agreement between Bell Farms and Sun Prairie as it is specifically referenced in the Land Lease.

77. The Federal Defendants' purported rescission of the Land Lease would deprive Bell Farms of its rights and entitlements under its management agreement with Sun Prairie without proper notice and an opportunity for a hearing.

78. The Federal Defendants' conduct violates the Fifth Amendment of the United States Constitution by impairing the obligations of Bell Farms and Sun Prairie under the management agreement, which arises from the Land Lease to which the Federal Defendants are a party.

79. Bell Farms is entitled to a declaration that the Federal Defendants' conduct violates the Due Process Clause by impairing the above-referenced contractual obligations.

**COUNT FIVE**
**(Declaratory Judgment, 28 U.S.C § 2201)**

80. Plaintiffs restate and reallege paragraphs 1 through 58 of their Complaint.

81. The Tribe executed and approved the Land Lease with Sun Prairie in which mutual rights and obligations were undertaken.

82. Sun Prairie has complied with all obligations and duties in the Land Lease.

83. Sun Prairie is entitled to a declaration that the Tribe is bound by the terms and conditions of the Land Lease.

**COUNT SIX**
**(Breach of Contract)**

84. Plaintiffs restate and reallege paragraphs 1 through 58 of their Complaint.

85. The Tribe promised in the Land Lease that during any kind of controversy, including a dispute as to validity, it would continue in its performance of the provisions of the Land Lease and that Sun Prairie would remain in possession of the premises as tenant.

86. The Tribe promised in its Land Lease that it would agree to execute necessary amendments to the Land Lease to effectuate the goals and purposes of the agreement.

87. The Tribe, instead, engaged in a pattern of conduct to frustrate and interfere with operation and construction of the project.

88. The Tribe's President Kindle, instead, has refused to consider a proffered amendment and has expressed his intent to "take over" the premises on which the Project is located.

89. The Tribe's conduct constitutes breach of the Land Lease causing harm, including money damages, to Plaintiffs.

**COUNT SEVEN**
**(Alternative Count -- U.S. Const. Art. I Impairment of Contract)**

90. Plaintiffs restate and reallege paragraphs 1 through 58 of their Complaint.

91. The Tribe executed and approved a Land Lease with Sun Prairie in which mutual rights and obligations were undertaken.

92. Even if the Tribe's conduct does not amount to a breach, the Tribe subsequently enacted legislation, engaged in conduct, and exercised its legislative and administrative authority in a manner that has substantially impaired obligations of contract in violation of Article I, § 10 of the United States Constitution.

93. Plaintiff Sun Prairie has been harmed as a result of the Tribe's impermissible conduct and is entitled to a declaration that the Tribe has materially altered the binding force, rights and duties, and expectations under the agreement in violation of the Contracts Clause.

**COUNT EIGHT**
**(Alternative Count -- Promissory Estoppel)**

94. Plaintiffs restate and reallege paragraphs 1 through 58 of their Complaint.

95. Even if the Land Lease executed by the Tribe is not enforceable as a contract, the Land Lease still constitutes a clear and definite promise by the Tribe.

96. The Tribe as promissory should reasonably expect that its conduct in executing the Land Lease would induce action on the part of the Plaintiffs.

97. The Tribe's conduct did in fact induce action on the part of the Plaintiffs: the Plaintiffs entered into, among other things, subsequent construction and farming operations, contracts for delivery of hogs with other parties, and financing commitments.

98. As a direct and proximate cause of the Tribe's conduct, the Plaintiffs have been damaged including but not limited the loss of business goodwill, inability to carry out contractual commitments to third parties as promised, and monetary damages.

99. The Tribe's promise is binding, and injustice can be avoided only by enforcement of the promise.

**COUNT NINE**
**(Alternative Count -- Unjust Enrichment)**

100. Plaintiffs restate and reallege Paragraphs 1 through 58 of their Complaint.

101. Even if the Land Lease does not constitute an enforceable contract against the Tribe, the Plaintiffs conferred benefits in the form of an initial payment of $100,000, lease payments and significant physical improvements under the Land Lease upon the Tribe, and employment of

tribal members, and the Tribe will continue to receive some or all of these benefits even if the Land Lease is not enforceable.

102. The Tribe was and is cognizant of the benefits it received under the mutual promises made in the Land Lease.

103. The Tribe has retained these benefits without reimbursement to the Plaintiffs and has been unjustly enriched by its conduct.

104. As a direct and proximate cause, the Plaintiffs have suffered money damages and loss of business goodwill.

**COUNT TEN**
**(U.S. Const. Art. I Impairment of Contract)**

105. Plaintiffs restate and reallege paragraphs 1 through 58 of their Complaint.

106. Plaintiff Bell Farms has an agreement with Plaintiff Sun Prairie to provide management and other services in connection with the Project as allowed and contemplated by the Land Lease to which the Tribe is a party.

107. The Tribe has knowledge of the agreement between Bell Farms and Sun Prairie.

108. The Tribe subsequently enacted legislation, engaged in conduct, and exercised its legislative and administrative authority in a manner that has substantially impaired obligations of contract in violation of Article I, § 10 of the United States Constitution.

109. Plaintiff Bell Farms has been harmed by the Tribe's impermissible conduct and is entitled to a declaration that the Tribe has materially altered the binding force, rights and duties and expectations under the agreement in violation of the Contracts Clause.

**COUNT ELEVEN**
**(Interference with Contract)**

110. Plaintiffs restate and reallege paragraphs 1 through 58 of their Complaint.

111. The Plaintiff Sun Prairie had a valid business relationship and expectancy in the management contract with Bell Farms.

112. The Plaintiff Sun Prairie had a valid business relationship and expectancy in its contract with a Colorado grower to purchase approximately 525,000 weanling pigs per year for finishing at its Rosebud farms.

113. The Plaintiff Sun Prairie had a valid business relationship and expectancy in its contract with a packing company to deliver approximately 525,000 slaughter hogs per year from its Rosebud farms.

114. The Tribe had knowledge of Sun Prairie's relationship and expectancy in its management contract with Bell Farms and its commitments to purchase, finish and deliver hogs for its customers.

115. The Tribe, with deliberate intent and without justification, engaged in a pattern of conduct to obstruct operation of the Rosebud farms and Sun Prairie's pork production, interfering with Sun Prairie's contractual relationships and expectations in the aforementioned agreements.

116. Sun Prairie as a direct and proximate result suffered damages including but not limited to financial harm, increased operational costs, and loss of business goodwill.

**COUNT TWELVE**
**(Interference with Contract)**

117. Plaintiffs restate and reallege paragraphs 1 through 58 of their Complaint

118. Plaintiff Bell Farms had a valid business relationship and expectancy in the management contract with Sun Prairie.

119. The Tribe had knowledge of Bell Farms' relationship and expectancy in its management contract with Sun Prairie.

120. The Tribe, with deliberate intent and without justification, engaged in a pattern of conduct to obstruct operation of the Rosebud farms and Sun Prairie's pork production, interfering with Bell Farms' contractual relationships and expectations in the aforementioned agreement.

121. Bell Farms as a direct and proximate result suffered damages including but not limited to financial harm, increased operational costs and loss of business goodwill.

**COUNT THIRTEEN**
**(Alternative Count – Unconstitutional Taking)**

122. The Plaintiffs restate and reallege Paragraphs 1 through 58 of their Complaint.

123. Plaintiff Sun Prairie has a protected property interest and entitlement in the Land Lease executed by the Tribe and approved by Regional Director Jones and in the property that is the subject of the Land Lease.

124. The Federal Defendants' conduct rescinding the Land Lease prevents Sun Prairie from conducting and developing farming operations and receiving the benefits under the Land Lease to which it would otherwise be entitled.

125. The Federal Defendants' conduct has damaged Sun Prairie, among other ways, as follows: Sun Prairie's Land Lease rights, including (without limitation) its rights to farming operations at Rosebud as set forth in the Land Lease, have been rendered valueless, and Sun Prairie has been deprived of all economically beneficial or productive use of its rights under the Land Lease, including (without limitation) its rights to conduct farming operations at Rosebud.

126. Plaintiffs are entitled to a declaration that the Federal Defendants' conduct constitutes a taking, for which compensation is available in a subsequent action in Claims Court.

**COUNT FOURTEEN**
**(Injunctive Relief)**

127. Plaintiffs restate and reallege Paragraphs 1 through 58 of their Complaint.

3. A declaration that the Federal Defendants are liable to Sun Prairie under the Fifth Amendment for impairment of obligation of contract.

4. A declaration that the Federal Defendants are liable to Bell Farms under the Fifth Amendment for impairment of obligation of contract.

5. A declaration that the Tribe is bound by its Lease with Sun Prairie.

6 An award of damages against the Tribe to be determined at trial for breach of contract.

7. Alternatively, a declaration that the Tribe is liable to Sun Prairie for impairment of contract obligations in violation of Article I, § 10 of the United States Constitution.

8. Alternatively, an award of damages against the Tribe to be determined at trial based upon Sun Prairie's reasonable reliance on the Tribe's promises.

9. Alternatively, an award of damages against the Tribe to be determined at trial based upon the Tribe's unjust enrichment at the Plaintiffs' expense.

10. A declaration that the Tribe is liable to Bell Farms for its impairment of contract obligations in violation of Article I, § 10 of the United States Constitution.

11. An award of damages against the Tribe to be determined at trial based upon the Tribe's interference with Sun Prairie's contractual relationships and expectations.

12. An award of damages against the Tribe to be determined at tribal based upon the Tribe's interference with Bell Farms' contractual relationships and expectations.

13. A declaration, if the Federal Defendants' conduct is authorized, that the Federal Defendants are liable to Sun Prairie for taking its property entitlements and interests in violation of the Takings Clause.

14. Injunctive relief against the Federal Defendants and the Tribe to prevent irreparable harm to the Plaintiffs' interests.

15. An award of Sun Prairie's costs, disbursements and attorney's fees in this action;

16. Such other relief as is deemed just and equitable.

Dated this 14th day of Aug., 2002

DORSEY & WHITNEY LLP

Skip Durocher
Mark R. Kaster
Of Counsel
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

MAY, ADAMS, GERDES & THOMPSON

Charles M. Thompson
Neil Fulton
P.O. Box 106
Pierre, SD 57501-0160
(605) 224-8803

SUN PRAIRIE, A PARTNERSHIP

Gregory A. Fontaine
General Counsel
7900 International Drive, Suite 200
Bloomington, MN 55425
(952) 854-8437

Attorneys for Sun Prairie and Bell Farms