# EXHIBIT H

PART 3 of 3

not serve to abrogate this Lease. No member of, or delegate to, Congress or Resident Commissioner shall be admitted to any share or part of this Lease or to any benefit that may arise hereunder, but this provision shall not be construed to extend to this contract if made with a corporation or company for its general benefit. During any period when the Premises are in trust or restricted status, all of the Lessee's obligations under this Lease, and the obligations of its sureties, are to the United States as well as to the Tribe.

35. Successors Bound. The terms of this Lease shall benefit and be binding upon the successors and assigns of the Tribe and the successors and permitted assigns of the Lessee in like manner as upon the original parties, except as otherwise provided in this Lease. The term "Lessee," as used in this Lease, means the Lessee and any person or entity succeeding to the interest of Lessee as tenant under this Lease, in accordance with the provisions of this Lease and applicable law.

36. Quiet Enjoyment. The Tribe covenants that at all times during the term of this Lease, so long as no uncured Event of Default has occurred and is continuing hereunder, the Lessee's quiet enjoyment of the Premises or any part thereof shall not be disturbed by any act of the Tribe or anyone acting by, through or under the Tribe.

37. Notices. Any notice required by or sent pursuant to any provision of this Lease shall be in writing and shall be deemed given if and when it is personally delivered or sent by certified mail addressed, until some other address is designated in a notice so given, as follows:

| | |
|---|---|
| If to Tribe: | Norman G. Wilson<br>President<br>Rosebud Sioux Tribe<br>11 Legion Avenue<br>Rosebud, South Dakota 57570 |
| With copies to: | Terry L. Pechota<br>Viken, Viken, Pechota,<br>Leach & Dewell, LLP<br>1617 Sheridan Lake Road<br>Rapid City, South Dakota 57702 |
| If to Lessee: | Sun Prairie<br>509 Dakota Avenue<br>Wahpeton, North Dakota 58075 |

Attention: Richard Bell

With copies to:

Russell F. Freeman, Esq.
Nilles, Hansen & Davies, Ltd.
1800 Radisson Tower
201 North Fifth Street
P.O. Box 2626
Fargo, North Dakota 58108

With copies to:

Thomas R. Manthey, Esq.
Dorsey & Whitney LLP
Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota 55402

Any notice required by or sent pursuant to any provision of this Lease shall also be sent to any Permitted Mortgagee.

38. Governing Law. This Lease shall be construed for all purposes in accordance with and governed by the laws of the Tribe, provided however that any change in the laws of the Tribe occurring after the adoption of the Resolution by the Tribal Council shall not constitute a part of the law governing this Lease if such change will have an adverse effect on the rights of any party hereto or any Permitted Mortgagee or if such change is intended to or will have the effect of limiting, restricting or adversely effecting the enforceability of this Lease in accordance with its terms, conditions and provisions.

39. Recording. Following approval by the Secretary, this Lease, or a memorandum of this Lease in the form prescribed by South Dakota law, shall be recorded in the appropriate Land Titles and Records Office of the Bureau of Indian Affairs, in the appropriate land records of the County of Mellette, South Dakota and any land records of the Tribe.

40. Invalid Provisions. If any clause, section, article, paragraph, or subparagraph of this Lease shall be unenforceable or invalid, such material shall be read out of this Lease and shall not affect the validity of any other clause, section, article, paragraph, or subparagraph, or give rise to any cause of action of either party to this Lease against the other, and the remainder of this Lease shall be valid and enforceable to the fullest extent permitted by law.

41. Waiver. The waiver by the Tribe, the Lessee or any Permitted Mortgagee of, or the failure of the Tribe, Lessee or any Permitted Mortgagee to take action with respect to, any breach of any term, covenant, condition, provision,

restriction, or reservation herein contained, shall not be deemed to be a waiver of such term, covenant, condition, provision, restriction, or reservation or subsequent breach of same, or of any other term, covenant, condition, provision, restriction, or reservation herein contained. The Tribe and/or the Lessee may grant a waiver of any term of this Lease, but such must be in writing and signed by the Tribe or Lessee, as the case may be, before being effective.

42. Saving Clause. If for any reason the term of this Lease, or any renewal thereof, or any substantive provision thereof, shall be found to be unenforceable, illegal or violative of public policy, this Lease shall automatically be amended to conform to the applicable decision, and each party hereto expressly agrees to execute any amendment necessary to effectuate the goals and purposes of this Lease.

43. Force Majeure. If any dispute shall arise under any provision of this Lease as to whether the Lessee shall have commenced promptly or within any limit of time specified in this Lease or proceeded continuously and with diligence with any required construction, repair, replacement or other performance, there shall be a suspension of required performance during the period of delay caused by any acts of God or by strikes which affect the building industry generally or the Premises specifically or by orders, directives or regulations of any governmental agency or board, the unavailability of the materials reasonably required for any such construction, repair, replacement or performance, any delays in adjusting any insurance loss, and any other delays caused by causes beyond the reasonable control of Lessee. The provisions of this paragraph 43 shall not, however, apply to a default by the Lessee in the payment of any Term Rent, Additional Rent or TECRO Fees to be paid by the Lessee under the provisions of this Lease.

44. Estoppel Certificate. The Tribe and the Lessee, promptly upon any request therefor from the other or by a Permitted Mortgagee, shall execute, cause such signature to be acknowledged by a notary public and deliver to the other or to a third person, if so directed by the other, a statement in writing identifying this Lease and the parties hereto and declaring, as of the date thereof, the following and such other matters as may be reasonably required by the party making such request:

(a) Whether or not this Lease is in default, and, to the extent that any default does then exist, the nature of any such default, including any event which may constitute an Event of Default upon the mere passage of time or notice or both;

(b) Whether or not this Lease is in full force and effect and that this Lease has not been modified except as provided in an amendment or amendments identified therein, stating further that this Lease as so amended is in full force and effect;

(c) The date to which the rent and other charges required to be paid under this Lease have been paid by or on behalf of the Lessee;

(d) That the Tribe has not conveyed, assigned, transferred or delegated any right or duty of the Tribe hereunder, nor has the Tribe encumbered or otherwise hypothecated the Tribe's reversionary interest in and to the Premises or any rights hereunder except as may be set forth in such statement; and

(e) That any such statement may conclusively be relied upon by the Tribe, the Lessee and any Permitted Mortgagee or any proposed Permitted Mortgagee in making a loan to the Lessee or by any title insurance company which issues a title insurance policy or other guaranty or endorsement relating to the existence and status of this Lease.

45. No Merger. So long as any Permitted Mortgage is in existence, unless Lessee and all Permitted Mortgagees shall otherwise expressly consent in writing, the fee title to the Premises and the leasehold estate created by this Lease shall not merge with any other estate.

46. Third Party Beneficiaries. This Lease is intended to benefit any Permitted Mortgagee including, without limitation, U.S. Bancorp, whose acceptance hereof is waived.

47. Compliance with 25 U.S.C. §81. In compliance with 25 U.S.C. §81 the residence and occupation of the parties is stated as follows:

| | |
|---|---|
| Party in interest: | Rosebud Sioux Tribe |
| Residence: | P.O. Box 430<br>Rosebud, SD 57570 |
| Occupation: | A federally recognized Indian Tribe |
| Party in interest: | Sun Prairie, a Nebraska General Partnership |
| Residence: | 509 Dakota Avenue<br>Wahpeton, North Dakota 58075 |
| Occupation: | Operation of pork production facilities |
| Scope of Authority: | The Tribe is authorized to execute the within document by a resolution adopted by the Tribal Council of the Tribe at a meeting at Rosebud, |

South Dakota, on August 19, 1998. The Tribal Council exercises its authority in this instance because it believes the acquisition and operation of the Project to be in accordance with the long-range economic objectives of the Tribe.

48. Trust Land. The Tribe represents that the Premises are Indian Trust Land and are therefore not subject to taxation by any County Government or the regulatory authority of any department of the State of South Dakota.

49. South Dakota Law. To the extent any South Dakota agencies or County should claim regulatory, licensing or taxing authority over the Premises, the parties agree to renegotiate and adjust the terms of this Lease as appropriate to adjust for such regulatory, licensing or taxing authority or claim.

50. Relationship of Parties. It is understood and agreed that the relationship of the parties hereto is strictly that of lessor and lessee and that this Lease shall not be construed as a joint venture or partnership. Lessee is not and shall not be deemed to be an agent or representative of the Tribe.

51. Guaranty. The obligations of the Lessee to the Tribe under this Lease shall be personally guaranteed by Mr. Richard Bell, general partner in the Lessee, pursuant to a separate Guaranty Agreement ("Guaranty"); provided, that:

(a) the obligations of Mr. Bell under the Guaranty shall be subject to the same limitations on liability as apply to the Tribe and the Lessee under paragraph 30(d) of this Lease;

(b) the benefit of such Guaranty shall run solely to the Tribe and may not be assigned by the Tribe;

(c) any claim against the Lessee under this Lease which is also guaranteed under the Guaranty shall first be asserted against the Lessee and judgment satisfied out of the assets of the Lessee (subject to the limitations on liability thereof under paragraph 30(d) of this Lease), with recourse by the Tribe under the Guaranty being limited to an action to recover any amount remaining unsatisfied on such judgment after exhaustion of action against the Lessee; and

(d) all obligations of Mr. Bell under the Guaranty shall terminate upon his death and shall not be an obligation of his heirs.

52. Required Reclamation Plan. The Required Reclamation Plan shall mean the Bureau of Indian Affairs Reclamation Plan more fully defined and

STATE OF SOUTH DAKOTA )
) ss.
COUNTY OF PENNINGTON )

On 9/8, 1998, NORMAN G. WILSON, personally appeared before me, signer and sealer of the foregoing instrument, who acknowledged that he executed the instrument as the President of the ROSEBUD SIOUX TRIBE, a federally recognized Indian tribe, as his free act and deed and the free act and deed of the Tribe.

Notary Public
My Commission Expires: 6-5-2003
Kenneth R. Dewell

Seal

STATE OF SOUTH DAKOTA )
) ss
COUNTY OF PENNINGTON )

On 7/8, 1998, RICH BELL, personally appeared before me, signer and sealer of the foregoing instrument, who acknowledged that he or she executed the instrument as the General Partner of SUN PRAIRIE, a Nebraska General Partnership, as his/~~her~~ free act and deed and the free act and deed of the General Partnership.

Notary Public
My Commission Expires: 6-5-2003
Kenneth R. Dewell

Seal

345 54214

Approved Pursuant to 25 U.S.C. §§ 81 and 415 and 25 C.F.R. § 162.5:

United States Department of the Interior, Bureau of Indian Affairs:

Date: 16 Sept 98

By: Cora L Jones

Area Director of the Aberdeen Area Office of the Bureau of Indian Affairs for the Secretary of the Interior and the Commissioner of Indian Affairs, acting under delegated authority

SEP 17 1 19 PM '98
ABERDEEN AREA OFFICE

RECORDED B.I.A. - LTRO

STATE OF So Dak )
) ss.
County OF Todd )

On Sept 16, 1998, personally appeared before me, Harold W. Compton a Notary Public in and for said County and State, Cora L. Jones, personally known to me to be the person whose name is subscribed to the above instrument, who acknowledged that he or she executed the instrument as the Area Director of the Aberdeen Area Office of the Bureau of Indian Affairs, for the Secretary of the Interior and the Commissioner of Indian Affairs, acting under delegated authority.

Harold W. Compton

Notary Public
My Commission Expires: Apr. 12, 2001

STATE OF SOUTH DAKOTA — HAROLD W. COMPTON — NOTARY PUBLIC — Seal

EXHIBIT A

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Agreement") is entered into effective as of the 1st day of May, 1997, by and between **SUN PRAIRIE, A PARTNERSHIP**, A Nebraska General Partnership (the "**Owner**") and **BELL FARMS LLP**, a North Dakota Limited Liability Partnership ("**Bell**").

## Preamble

By this Agreement the Owner is engaging Bell to provide management services relating to the operation of Owner's nursery and finishing facilities (the "**Facilities**") for the production of
feeder pigs and market hogs which will be sold to Hormel Foods Corp. through long-term slaughter hog agreements.

## I. General Assumptions

1.1 General Responsibility of Bell. During the term of this Agreement, Bell assumes responsibility to implement the policies, budget and goals for the Facilities established by the Owner and, within the annual approved budget, to: supervise the day-to-day operations of the Facilities; employ the personnel to operate the Facilities, select and purchase equipment, purchase feed and supplies; maintain and provide the Owner with production record keeping and Facilities accounting information; and, make recommendations as to future budgets and operations of the Facilities. These services are more particularly described in Article II.

1.2 General Responsibility of Owner. During the term of this Agreement, the Owner retains responsibility to establish and periodically review and change as necessary the policies, budget, and short-range and long-range goals of the Facilities. The Owner retains the right to review and evaluate the performance of Bell in carrying out the policies and in attaining the budget and the goals established by the Owner. These responsibilities are more particularly described in Article III.

## II. Specific Responsibilities of Bell

2.1 Management. Bell shall:

2.1.1 Recommend policies and goals to be established by the Owner, and regularly evaluate policies and goals;

2.1.2 Select and arrange the layout of buildings, equipment, feed and watering systems, capital items and replacements, and all other systems needed to operate the Facilities.

2.1.3 Supervise the day-to-day operations of the Facilities, subject to and in

accordance with the budgets and policies established from time to time by the Owner; and

2.1.4 Develop, install, and maintain specific operating procedures, systems and controls.

2.2 <u>Personnel</u>. Bell shall:

2.2.1 Hire, supervise, and compensate as employees of Bell for the Facilities, all employees as needed, and their replacements. Although the employees shall be employees of Bell, the total compensation and fringe benefits shall be reimbursed to Bell by the Owner. Compensation includes salary and performance incentives. Fringe benefits include: (i) all accruing payroll taxes including FICA taxes and state and federal unemployment contributions, (ii) all insurance premiums which are based on payroll, including workers' compensation and employer's contribution to group life, medical insurance and retirement plans, and (iii) vacations. Bell retains the right to transfer personnel so long as the agreed service functions remain fulfilled.

2.2.2 Establish personnel policies, procedures, and forms and identify resources to be made available;

2.2.3 Recommend appropriate employee compensation and benefit plans that are competitive within the industry and the locale, for approval by Owner;

2.2.4 Recommend employee performance appraisal and goal setting programs; and

2.2.5 Supervise Facilities management with on-site visits by appropriate Bell home office executives and staff.

2.3 <u>Operations</u>. Bell shall:

2.3.1 Recommend the general type, amount, and layout of equipment to be purchased for the Facilities;

2.3.2 Select and purchase for Owner equipment of the general character and cost approved by the Owner and maintain the buildings and equipment in good condition, subject to normal wear and use;

2.3.3 Select and purchase for Owner high quality feeds and products and other supplies of the general character and amount approved by the Owner provided the quality and price thereof are competitive with others available;

2.3.4 Contract or provide veterinarian services for Owner as needed;

2.3.5 Maintain and operate all the resources necessary to house, feed, rear, and care for the nursery and finisher pigs (the **"Stock"**) in strict accordance with generally accepted practices and principles of good animal husbandry;

2.3.6 Assure the administration to the Stock of only those medications, vaccines, feed additives and other animal health products which have been approved by the USDA and in accordance with the manufacturers' label instructions and acceptable management and sanitary practices;

2.3.7 Assure the acquisition and maintenance for Owner of all required municipal, state and federal permits and/or licenses necessary in connection with construction and operation of the Facilities and the maintenance of the Stock;

2.3.8 Dispose of all waste and dead animals promptly and in a manner consistent with accepted management practices, and in strict compliance with all applicable state and federal environmental, public health and other laws and regulations;

2.3.9 Arrange deliveries of all pigs to the nurseries, finishers and slaughter plant;

2.3.10 Coordinate the sale and delivery of feeder pigs to Growers, as defined in the New Generation Feeder Pig Sales Agreement between Owner and Growers;

2.3.11 Establish and enforce good biological security, vaccination, sanitation and health practices;

2.3.12 Operate the Facilities including the handling and disposal of waste and carcasses, in compliance with all local, state, and federal laws and regulations pertaining to environmental, employment, workplace safety, transportation, taxation, public health or animal production matters;

2.3.13 Assure that the feeder pigs, when sold to Growers, are free and clear of any liens or encumbrances; and

2.3.14 Arrange for Owner insurance coverage in amounts reasonably satisfactory to Owner, insuring the Facilities and the Stock against damage or destruction and protecting against claims of injury to any persons resulting from the business.

2.4 Financial Controls. Bell shall establish and maintain a system of production and financial record keeping (using a generally accepted system of production record keeping such as, but not limited to, "Pig Champ"), Facilities accounting information and financial controls for the Facilities as follows:

2.4.1 On a monthly basis Bell shall maintain a set of books and records in accordance with GAAP that reflects the production and financial results, in such detail as may be agreed upon between Owner and Bell from time to time;

2.4.2 On a monthly basis Bell shall assimilate Owner's monthly Statement of Operations of the Facilities and the production results with general Owner financial information and provide a report, in such detail as may be agreed upon between Owner and Bell from time to time;

2.4.3 On a monthly basis Bell shall coordinate the Facilities financial information with Owner's general financial information and prepare and analyze the:

A. Owner's Balance Sheet

B. Owner's Income Statement

C. Owner's over-all General Ledger

D. Owner's Statement of Cash Flows

E. Owner's Comparative Operating Statistics

2.4.4 Conduct or cause to be conducted certain administrative functions, including arrangement of financing, banking, financial reporting, insurance, legal, tax reporting, and other similar administrative functions.

2.4.5 On an annual basis:

A. Assist the Owner in the preparation of annual budgets for operating revenue and expense and capital expenditures for the Facilities. Budgets shall be prepared in advance of each fiscal year. Facilities cash flow projections shall accompany each operating budget. It is understood that budgets are only estimates and guidelines of future results and that budget overruns may occur.

B. Assist the Owner to project the long-term financial position of the Facilities through the preparation and review of a 5-year cash flow.

C. Maintain ongoing data accumulation to help determine customary statistics on the production results at the Facilities.

2.4.6 Bell shall provide qualified personnel to assist in establishing and maintaining the Owner's accounting system. Bell will maintain internal control procedures requested by Owner, and Owner shall be entitled to review and audit

accounting records and documents at its discretion. Bell shall receive from the Owner all Owner maintained monthly financial information.

2.5 **Dealing with Affiliates**. Bell may cause goods and services furnished under this Article II to be acquired from persons or entities affiliated with Bell, provided they are furnished on terms as favorable to the Owner as would be provided by independent third parties, and are of at least equal quality as could be obtained from such third parties.

III. Specific Responsibilities of Owner

3.1 **Policy Determination**. The Owner shall:

3.1.1 Establish policies relating to the activities at the Facilities;

3.1.2 Adopt budgets to establish guidelines for revenue and expense;

3.1.3 Establish the short-range and long-range goals of the Facilities;

3.1.4 Review and evaluate the performance of Bell in carrying out the policies and in attaining the goals established by the Owner;

3.1.5 Periodically review and confirm or change the policies, budgets and goals of the Facilities; and

3.2 **Auditors**. The Owner shall retain the services of a certified public accounting firm, at Owner's cost, to perform annual certified audits, to prepare tax returns, to prepare any other reports required for federal or state regulatory agencies which require licensure and/or certification, and to perform other necessary accounting services relating to the Facilities. While such certified public accounting firm shall be directly responsible to the Owner, it shall be expected to cooperate with and assist Bell and Owner in the development and maintenance of the Facilities accounting and financial control systems and in fulfilling the obligations of Bell hereunder. Bell shall not perform or have the responsibility for the performance of accounting services in connection with the activities arising hereunder, except as otherwise provided in Section 2.4.

3.3 **Operating Reports; Meetings**. During the term of this Agreement, the Owner shall, within 30 days of issuance, furnish to Bell copies of all monthly, annual or other periodic financial information, reports, projections (with assumptions), operating statistics and other analytical information pertaining to the Facilities (other than any such information received by the Owner from Bell).

3.4 **Owner Insurance**. During the term of Agreement, the Owner shall apply for and maintain, at Owner's expense, with reputable and financially sound insurance firms, policies of

insurance to insure itself and Bell against public liability (including contractual liability insurance as applicable to Owner's obligations under section 6.8), professional liability, workers' compensation, fire and extended coverage, boiler and machinery, property, all risk, and such other policies in amounts as necessary and proper for the ownership and operation of the Facilities. The Owner may obtain any additional insurance coverage that it deems advisable. The Owner agrees to include Bell as an additional insured on all such policies which permit such designation and to provide Bell with complete copies of such policies and certificates of insurance which evidence such coverage. Such policies shall be endorsed to provide that such insurance is primary to any insurance purchased directly by Bell, and is not excess or contributing insurance. If the Owner fails to obtain and maintain such insurance with amounts and coverage normally provided Bell in similar facilities managed by Bell, Bell may obtain such insurance for its own benefit, and the cost thereof shall be a reimbursable expense pursuant to section 5.2.

3.5 <u>Cooperation</u>. The Owner shall cooperate with Bell in every respect and shall furnish Bell all information required by it for the performance of its services and shall permit Bell to examine and copy any data in possession and control of the Owner affecting management and/or operation of the Facilities and shall in every way cooperate to enabie Bell to perform its services satisfactorily.

3.6 <u>Banking</u>. The Owner shall maintain an account in the Owner's name at a federally insured bank and shall designate Bell as signatories of accounts therein. The account may be drawn upon to meet payroll obligations to employees of the Facilities as provided in Section 2.2. and operating expenses as provided in Section 2.3.

IV. <u>Term and Termination</u>.

4.1 <u>Term</u>. This Agreement shall commence on the date set forth on the first page hereof and shall continue until terminated by the mutual written agreement of Bell and Owner or terminated for cause as provided in Section 4.2.

4.2 <u>Termination for Cause</u>. Notwithstanding the foregoing, this Agreement may be terminated by either party if the Owner's existence is terminated, or if the other files or has petition or complaint in receivership or bankruptcy filed against it which has not been dismissed within 30 days of such filing, or makes a general assignment for the benefit of its creditors, or if the other party fails to properly perform the obligations imposed upon it under this Agreement. In the event that a party elects to terminate this Agreement as a result of the occurrence of any event specified in the preceding sentence, it shall give the other party 60 days' written notice of such termination and of the cause therefor, and such termination shall be effective sixty (60) days after the mailing thereof, unless the stated grounds for termination have been remedied by the other party prior to that date.

4.3 <u>Consequence of Termination</u>. If this Agreement is terminated under section 4.1

or 4.2 above, Bell shall be entitled to an amount equal to its earned but unpaid compensation, together with full reimbursement of all costs and expenses otherwise reimbursable hereunder, payable immediately, and neither party shall have any further obligations to the other, except as provided in Section 6.8.

## V. Compensation and Reimbursement

5.1 Compensation. The Owner shall reimburse Bell for all of Bells direct and indirect costs allocable to performance of the services identified in Article II hereof, including without limitation salaries and benefits and other costs of Bells employees providing the services, out-of-pocket expenses, expenses for computers, materials and supplies, travel expenses, an allocable amount of general overhead, and legal, accounting and other consultants fees. On a monthly basis Bell shall submit to the Owner a statement of costs and the Owner shall reimburse Bell the amount set forth on each monthly statement, within 15 days after receipt of such statement. Bell shall submit an annual budget of Bells direct and indirect costs allocable to the performance of services hereunder to the Owner for its approval.

## VI. General.

6.1 Insurance Subrogation. No indemnity shall be paid to the other party under this Agreement where the claim, damage, liability, loss or expense incurred was or was required to be insured against by such other party for whose benefit such indemnity would run. Any insurance policies obtained by the parties pursuant to this Agreement shall contain provisions or have the effect of waiving any right of subrogation by the insurer of one party against the other party or its insurer. Each party hereby releases the other from any claims to the extent covered by insurance obtained by the parties pursuant to this Agreement.

6.2 Standard of Care. Bell shall exercise good faith and ordinary care, and consider the best interests of the Owner in carrying out the duties an responsibilities of this Agreement.

6.3 Entire Agreement. This Agreement sets forth the entire agreement relating to its subject matter, between Bell and Owner. Any changes or modifications of this Agreement must be in writing and signed by all parties hereto.

6.4 Assignment. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns. Notwithstanding the foregoing, neither party shall, without prior written approval of the other party, assign any of its rights or obligations under this Agreement, except in the event of a merger of a party with or into another entity which has a net worth at least equal to that of the assignment party and which assumes all of such party's obligations, and the provision of notice thereof to the other party.

6.5 Governing Law. This Agreement and its interpretations, validity and performance shall be governed by the laws of the State of North Dakota. Each of the parties consents to the jurisdiction of the state and federal courts in North Dakota and to all venues therein, and each party waives all rights to a jury trial and punitive damages in any such proceeding.

6.6 Conditions Beyond Control of Parties. Neither party shall be held liable for a failure to comply with any of the terms of this Agreement when such failure has been caused solely by fire, a swine disease epidemic in the general area of the Facilities, labor dispute, strike, war, insurrection, government restrictions, force majeure, or act of God beyond the control and without fault on the part of the party involved, provided such party uses due diligence to remedy any such default which can be remedied.

6.7 Notices. Any notices, demands, consents or other communications hereunder (collectively, "**notices**") shall be in writing and, unless otherwise specifically provided, shall be deemed effective when delivered personally or sent by registered or certified mail, first class postage prepaid, addressed as follows:

6.7.1 If addressed to Bell:

Bell Farms
509 Dakota Avenue
Wahpeton, North Dakota 58075
Attention: Rich Bell

With a copy to:

Russell F. Freeman, Esq.
Nilles, Hansen & Davies, Ltd.
1800 Radisson Tower
201 North Fifth Street
P.O. Box 2626
Fargo, North Dakota 58108

If addressed to Owner:

Executive Committee
Sun Prairie, A Partnership
509 Dakota Ave.
Wahpeton, ND 58075

With a copy to:

Ted Kessner
Crosby, Guenzel, Davis, Kessner
& Kuester
134 S. 13th St., Suite 400
Lincoln, NE 68508

or as to any party, at such other address as such party may specify to the other party in a notice given in compliance with this section 6.7.

6.8 **Indemnification**. The Owner shall defend, indemnify and hold Bell harmless from all costs incurred by Bell in the defense of any claims relating to the Facilities brought against Bell or any action relating to the Facilities in which Bell is named as a party, including reasonable attorney fees, costs of investigation, court costs and other such expenses except as and to the extent caused by the negligence, nonfeasance or malfeasance of Bell. This indemnification obligation shall survive termination of this Agreement, and is subject to the waiver of subrogation provisions of section 6.1

Bell shall defend, indemnify and hold the Owner harmless from and against all claims, actions, liabilities and expenses (including without limitation reasonable attorneys fees) which relate to or arise from any breach of this Agreement by Bell. This indemnification obligation shall survive termination of this Agreement, and is subject to the waiver of subrogation provisions of Section 6.1.

6.9 **Separability**. In case any one of the provisions hereof is determined to be invalid, illegal or unenforceable in any respect, the validity of the remaining provisions with in no way be affected, prejudiced or disturbed thereby.

6.10 **Arbitration.** Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association (AAA) and judgement upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitration proceedings shall be conducted in the City of Wahpeton, ND, U.S.A. or such other location as the parties may mutually agree. The arbitration shall be conducted by one (1) arbitrator mutually agreed upon between the parties. If the parties are unable to agree upon a single arbitrator within thirty (30) days of commencement of arbitration, each party shall select one arbitrator and the selected arbitrators shall select a third arbitrator in accordance with AAA Rules.

**IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement on the day and year first above written.

BELL FARMS LLP

By: Rick Bell

its Managing Partner

SUN PRAIRIE, A PARTNERSHIP

By: ______________________

its CEO

EXHIBIT B

Description of Phase I and II

Phase I is an operation of 24 wean to finish barns totaling 48,000 head and an operation of 24 wean to finish barns totaling 48,000 head.

Phase II is an operation of 25,000 sow and 250,000 head of finishing capacity.

EXHIBIT C

Legal Description of Premises

| BIA Tract Number | Legal Description |
|---|---|
| T-63 | SE 1/4, Sec 27, T42N, R30W |
| T-929.5 | E 1/2, Sec 16, T43N, R30W |
| T-1709.5C | SW 1/4, Sec 27, T42N, R30W |
| T-2113.5 | NE 1/4, Sec 16, T43N, R31W |
| T-2136.5 | S 1/2, Sec 30, T42N, R31W |
| T-5841 | NW 1/4, Sec 24, R43N, R31W |
| T-5890 | NE 1/4, Sec 15, T43N, R31W |
| T-5897 | NW 1/4, Sec 14, T43N, R31W |
| T-5901 | NW 1/4, Sec 23, T43N, R31W |
| T-5908 | SE 1/4, Sec 16, T43N, R31W |
| T-5960 | SE 1/4, Sec 17, T42N, R31W |
| T-5969 | NE 1/4, Sec 24, T42N, R31W |
| T-5977 | SW 1/4, Sec 20, T42N, R30W |
| T-5980 | Lots 3 & 4 and E1/4, SE 1/4, Sec 19, T42N, R30W |
| T-5991 | NW 1/4, Sec 27, T42N, R30W |
| T-~~11188~~ 11138 | NW 1/4, Sec 16, T42N, R31W |
| T-11233 | SW 1/4, Sec 23, T43N, R31W |
| T-11666 | N 1/2, Sec 32, T42N, R31W |

Potential Road Access Sites

| | |
|---|---|
| T-3860 | Lots 1 & 2 and E 1/2, NE 1/4, Sec 30, T42N, E30W |
| T-5898 | SW 1/4, Sec 14, T43N, R31W |
| T-5899 | SE 1/4, Sec 14, T43N, R31W |
| Rosebud Sioux Tribe Allotment RS-2053 | Lots 3 & 4 and E1/2, SE 1/4, Sec 30, T42N, R30W |

(a) Except as noted

Together with all easements and rights appurtenant thereto, if any.

EXHIBIT D


31 W
N
S1
S2
S3
S4
S5
F1
F2
F3
F4
F5
F6
F7
F8
CEDAR BUTTE
POST OFFICE
SD 44
NOTE:
S1 THRU S5 DENOTES 5,000 HEAD SOW UN
F1 THRU F8 DENOTES 48,000 HEAD FINISHI
SITES
31 W
0.5 MILE
1.0 MILE
1.0 MILE
1.0 MILE
1.0 MILE
1.0 MILE
ROSEBUD FARMS

# EXHIBIT E

## Permitted Encumbrances

Easements for highway right-of-way and utilities of record

EXHIBIT F

Schematic Plans and Specifications

The Schematic Plans and Specifications for the Project were prepared by National Swine Builders, LLC located at 412 Main Avenue, P.O. Box 205, Clear Lake, IA 50428. The telephone number for National Swine Builders is (515)357-1561. National Swine Builders has copies of the schematic plans and specifications.

EXHIBIT G

Tribal Licensing Permit and Governmental Approval Requirements

"Business" means any regular or temporary business activity engaged in by any person (includes partnership, joint venture, and corporation) for purposes of conducting a trade, profession or commercial activity involving the sale (which means the transfer, exchange or barter, conditional or otherwise, of the ownership of, title to, or possession of real or personal property for consideration).

The Business License requirement applies to all persons engaged in business within the exterior boundaries of the reservation (with exemptions, described in §16-1-204, which are not applicable to our situation).

All applications must include:

A. Description of the type of business;

B. Name and address of the owner or owners of the business;

C. Trade name, if any, to be used by the company;

D. Locations on the reservation at which the business will be conducted;

E. Sworn statement that the applicant will comply with all Tribal law applicable to the applicant's business;

F. Statement that the applicant consents to Tribal Court jurisdiction and service of process in matters arising from the conduct of business;

G. Name, address and signature of the agent who will accept service of process on behalf of the company.

# EXHIBIT H

## Tribal Taxes, Assessments, Fees and other Charges

1. TECRO as modified.
2. Land Lease Use Tax.

EXHIBIT I

Bureau of Indian Affairs Reclamation Plan

In the event that the Lease is terminated by reason of abandonment of the Premises by Lessee, Lessee as an operating expense under this agreement, shall be solely responsible to reclaim and restore the premises in the following manner:

1. Organic and/or Inorganic Wastes: Sludge accumulation will be monitored on an annual basis. Accumulated depths will be determined by using infrared sensing mechanical measuring devices (example: Markland Mark 10 LED). This device will indicate depth of sediment build-up above the anaerobic digester bottom when read in a vertical position from floating device (boat) on digester surface. When sludge accumulation reaches or exceeds the sludge accumulation design volume, the digester will be de-watered by approximately 85%. The remaining sludge and liquids will be mechanically agitated and pumped as a slurry onto adjacent designated disposal areas. Caution will be taken to insure the digester liner integrity during sludge removal. The slurry will be analyzed for N.P & K and soil injected with trail hose equipment. The custom applicator equipment can pump 1,000 gpm through a 6" line and soil injects the slurry waste. Wastes will be soil applied consistent with sound agronomic practices.

2. Anaerobic Digester: In the event this swine operation is discontinued, the buildings will be depopulated and cleaned. The anaerobic digester will be dewatered and sludge and sediment will be removed consistent with the previously mentioned plan. All waste will be analyzed for N.P & K and applied onto designated and approved application areas consistent with sound agronomic practices. The anaerobic digester will be left structurally intact. The anaerobic digester will be filled with fresh water at approximately 85% of capacity to protect the liner. All appropriate governing agencies will be notified of the abandonment of this facility.

3. All structures will be moved from the site. If it is impractical to move the structures, they will be dismantled and removed from the site.

4. All poured concrete will be lifted, stockpiled and removed from the site.

5. All excavated areas shall be backfilled and reshaped to complement the existing terrain. All slopes shall be set to grade of not steeper than a 4 to 1 slope.

6. Top soil shall be placed on all disturbed areas that require reseeding prior to establishing a permanent cover.

7. All disturbed areas will be established to a permanent cover to minimize erosion. A seedbed will be prepared that is free, or nearly free, of all competitive vegetation. A firm seedbed will be established. A seedbed is firm enough when it will support the weight of a person and their shoe or boot heel does not sink into the soil over a maximum of one half inch when they walk across the area to be seeded.

8. A seed drill shall be used to place the seed at the desired depth. The drill shall be equipped with a feeding mechanism that will provide a uniform flow of seed at the desired rate and packer wheels to press the soil firmly over the seed. In lieu of packer wheels, the area may be cultipacked after seeding. If difficulty is encountered with uniform seed flow through the drill, cracked corn, cracked wheat or rolled oats can be added to the seed box to aid in seed flow.

9. Seeds of most grasses should be planted at a depth between 1/4 to 3/4 inch.

10. The seeding mixture and seeding rates are as follows:

| | |
|---|---|
| Western Wheatgrass | 6.0 lbs. pure live seed per acre |
| Green Needlegrass | 4.0 lbs. pure live seed per acre |
| Side Oats Grama | 2.0 lbs. pure live seed per acre |
| Little Bluestem | 2.0 lbs. pure live seed per acre |
| TOTAL SEED | 14.0 lbs. pure live seed per acre |

11. Seed should be of local origin. (Harvested from points not over 200 miles away from the site.)

12. The seeding must be done between November 1 to April 15. This period applies to mixtures of cool-season species or mixtures of cool and warm-season species. Seeding must not be done when the soil is frozen so hard that seed cannot be planted at the proper depth and properly covered.

13. If broadleaf weeds emerge in the first year in significant amounts to interfere with the establishment of the native grass seeding, herbicides may be used for control. The best control will be attained when weeds are in the early stages of growth and the grass seedings have reached the three leaf stage of growth.

14. All seeding areas must be fenced and protected from grazing livestock to the end of the second growing season.

# GUARANTY

THIS GUARANTY ("Guaranty") is made November 2, 1998 by RICHARD BELL ("Guarantor"), in favor of the ROSEBUD SIOUX TRIBE, a federally recognized Indian Tribe (the "Tribe").

The Tribe and Sun Prairie, a Nebraska General Partnership (the "Lessee") have entered into a certain Land Lease (the "Lease") dated as of September 8, 1998.

NOW, THEREFORE, in consideration of the Tribe entering into the Lease, Guarantor hereby agrees with the Tribe as follows:

1. Guaranty. Subject to the provisions hereof, the Guarantor hereby unconditionally guarantees to the Tribe the full and complete payment and performance by the Lessee of its obligations under the Lease. Provisions to the contrary, if any, contained in this Guaranty notwithstanding, Guarantor's obligations under this Guaranty shall be subject to and limited by the provisions of paragraph 51 of the Lease.

2. Irrevocability. This Guaranty shall be irrevocable and shall continue, subject to the limitations stated in paragraph 1 of this Guaranty, so long as the Lessee's obligations under the Lease or any part thereof, shall remain unpaid or unperformed.

3. Severability. If any provision of this Guaranty shall be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Guaranty and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

4. Headings. Headings of the paragraphs of this Guaranty are inserted for convenience only and shall not be deemed to constitute a part hereof.

This Guaranty has been executed and delivered as of the date first above written.

Richard Bell
Richard Bell

United States Department of the Interior

SEP 21 98

BUREAU OF INDIAN AFFAIRS
Aberdeen Area Office
115 Fourth Avenue S.E.
Aberdeen, South Dakota 57401

IN REPLY REFER TO:
Land Titles and Records Office
MC-306A

SEP 18 1998

MEMORANDUM

To: Superintendent, Rosebud Agency

From: Area Director, Aberdeen Area

Subject: Land Lease and Leasehold Mortgage, Rosebud Farms Pork Production Facility

Enclosed is the original document relative to the Rosebud Farms Pork Production Facility. We have officially recorded the enclosed Land Lease and Leasehold Real Estate Mortgage in our Land Titles and Records office. A microfilm copy of the subject documents was produced and is on file in our Land Titles and Records office. The Land Lease was recorded under Document No. 345-54214. The Leasehold Mortgage was recorded under Document No. 345-54215.

If you have any questions concerning this matter, please refer them to Jim Geffre, Supervisory Legal Instruments Examiner, at 605-226-7393.

Cora L. Jones

Attachments

cc: Viken, Viken, Pechota, Leach & Dewell, LLP, Rapid City, South Dakota
Dorsey & Whitney, LLP, Minneapolis, Minnesota