# In the United States Court of Federal Claims

No. 05-1023 L
(Filed January 5, 2007)

| | | |
|---|---|---|
| ROSEBUD SIOUX TRIBE, a federally recognized Indian Tribe, Plaintiff, v. THE UNITED STATES, Defendant, | * | Judgment on the Pleadings; Breach of Trust; Statute of Limitations. |

*Mark F. Marshall*, Sioux Falls, S.D., for plaintiff.

*Caroline M. Blanco*, Environment and Natural Resources Division, Natural Resources Section, United States Department of Justice, Washington, D.C., for defendant, with whom were *John Turner*, Assistant Chief, Environment and Natural Resources Division, Indian Resources Section; and *Maria Wiseman*, Attorney-Advisor, United States Department of the Interior, Branch of Trust Resources, Division of Indian Affairs, Office of the Solicitor, Washington, D.C., of counsel.

## OPINION and ORDER

**Merow**, *Senior Judge*

This matter comes before the court on Defendant's Motion for Judgment on the Pleadings and plaintiff's opposition thereto. Plaintiff, the Rosebud Sioux Tribe (the "Tribe"), leased Tribal lands in Mellette County, South Dakota for fifteen years to Sun Prairie, a Nebraska general partnership, for the construction and operation of several pork production facilities (the "Project"or "Land Lease"). As detailed in documents submitted in response to the Motion for Judgment on the Pleadings before the court, the Project was sizeable (the third largest hog facility in the world), with estimated "production" of more than 800,000 hogs annually, consuming 1.6 million

gallons of water per day.[1/] The facilities would be managed by Bell Farms, a third party. The Tribe's remuneration included twenty-five percent of the projected five million dollars in annual profits.

By statute and regulation, the Bureau of Indian Affairs ("BIA") must approve and sign all leases of Tribal lands. Accordingly, the Tribe "requested the assistance of [BIA] Superintendent Burr to conduct any and all environmental assessments or other legal prerequisites which may have been required by the BIA prior to the BIA consenting to the Land Lease." (Compl. ¶ 12.) A public hearing on a draft Environmental Assessment ("EA") was held on June 15, 1998, and comments both in favor and in opposition were received. Written comments were also submitted. The EA was completed by the BIA on August 14, 1998, and the Aberdeen, South Dakota Office of the BIA recommended that Superintendent Larry Burr make a Finding of No Significant Impact ("FONSI"), which he did. Notice of the FONSI was published locally during August of 1998. (*Id.* ¶¶ 13-16.) As a result of the FONSI, no Environmental Impact Statement ("EIS") was required.

With Tribal Council authorization, Tribal President Norman Wilson signed the Lease on behalf of the Tribe on September 8, 1998. On September 16, 1998, Cora L. Jones, Area Director of the Aberdeen, South Dakota Area BIA Office, acting under delegated authority, approved and signed the Lease pursuant to 25 U.S.C. §§ 81 and 415.[2/] (Compl. ¶ 19.) The lease was recorded in the BIA's Land Title and Records Office. (Aff. of Mark Marshall in Supp. of the Tribe's Resp. to Mot. for J. on Pleadings ("Marshall Aff.") Ex. H unn. 51.) Thereafter, "Sun Prairie entered into loan obligations with a group of commercial banks in the amount of $44.5 million to fund the Project." (Compl. ¶ 21.)

Less than three months after the BIA signed the lease, on November 23, 1998, a Complaint was filed in the United States District Court for the District of Columbia against Secretary of the Interior Bruce Babbitt and Kevin Gover, the Assistant Secretary of Indian Affairs by: the Concerned Rosebud Area Citizens; Prairie Hills

---

[1/]Subsequent litigation history and the magnitude of the planned operation are outlined in *Commentary: In Hogs We Trust – A Million Pigs in the Parlor: The Bureaucracy of the Bureau of Indian Affairs' Conflicting Trust Roles,* 7 Great Plains Nat. Resources J. 267 (2002).

[2/]Defendant disputes the applicability of 25 U.S.C. § 81. (Answer ¶ 19; Def.'s Mot. 26 n.8). Because of the conclusions reached herein, the court does not address any disagreement in this regard.

Audubon Society of Western South Dakota; South Dakota Peace & Justice Center; and the Humane Farming Association (referred to collectively hereinafter in this and subsequently described litigation as "Concerned Citizens"). Concerned Citizens sought to enjoin construction of the Project. Neither the Tribe nor Sun Prairie was a party. *Concerned Rosebud Area Citizens v. Babbitt,* 34 F. Supp. 2d 775 (D.D.C. 1999) ("*Rosebud I*") (denying the government's motion for change of venue to South Dakota). In *Rosebud I*, Concerned Citizens challenged the BIA's approval of the Lease on substantive and procedural grounds, including alleged failure to comply with the National Environmental Policy Act ("NEPA") and violations of the National Historic Preservation Act ("NHPA"). In denying the motion for change of venue, District Court Judge Joyce Hens Green described internal Tribal conflicts concerning the Lease, a prelude to, and background for, subsequent developments.

> Certain factual representations were made to the Court which are repeated herein and are relied upon by this Court in making her ruling. The Rosebud Sioux Tribe inhabit an economically depressed area. The Tribal Government has agreed to the lease because construction and operation of the Facility will result in increased employment for the Rosebud Sioux. Bell Farms, which will operate the Facility on Sun Prairie's behalf, is one of the largest pork producers in the United States.
>
> Not all members of the Tribe agree that the economic benefits from the lease are worth the environmental costs, and some of those dissident members are also members in the plaintiff organizations.

*Rosebud I*, 34 F. Supp. 2d at 776.

At this time at least eight of the planned twenty-four buildings had been constructed. *Id.* Following the denial of the government's motion for change of venue,[3/] Concerned Citizens filed a motion for preliminary injunction on January 21, 1999. *Rosebud I* was settled shortly thereafter by Joint Stipulation for Dismissal based on a January 27, 1999 letter from Assistant Secretary Gover "in which Gover concluded that the EA did not comply with [NEPA] requirements and that there was

[3/] In its argument for change of venue to the District of South Dakota in *Rosebud I*, the government asserted the Tribe and Sun Prairie were indispensable parties. *Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194, 1197 (D.S.D. 2000) (subsequent history omitted) (relating history of prior litigation).

an insufficient basis for the issuance of a FONSI." (Compl. ¶ 28.) "Gover also declared that the consent and approval of the BIA to the Land Lease was void." (*Id.*) The Stipulation quoted the Gover letter that the lease was and always had been void for failure to fully comply with NEPA, memorialized the agreement of the parties to negotiate the amount of attorney fees and costs to be paid to plaintiffs, and concluded that "**[b]ecause the Lease is void**, the Parties agree that this case should be dismissed without prejudice." (Marshall Aff. Ex. A unn. 18-19 (emphasis supplied).) District Judge Green approved the Stipulation, with "IT IS SO ORDERED" on February 1, 1999, and it was filed on February 2, 1999. (*Id.*)

The next day, February 3, 1999, the Tribe and Sun Prairie filed suit against Assistant Secretary Gover and Secretary Babbitt in the United States District Court for the District of South Dakota "challenging [Gover's] authority and decision to void the lease and seeking a declaration that the EA prepared for the project complied with NEPA." *Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194, 1198 (D.S.D. 2000), *vacated on other grounds*, 286 F.3d 1031 (8th Cir. 2002) ("*Rosebud II*"). Noting that comments from the Environmental Protection Agency ("EPA") were not received until after the expiration of the comment period on the draft EA, and that approximately $5 million had been spent on construction, District Judge Kornmann granted preliminary injunctive relief on March 3, 1999, and permanent injunctive relief on February 3, 2000, finding the government engaged in affirmative misconduct.

> [T]he Court finds [Gover's] unilateral decision to void the lease, with or without authority, after the period within which to appeal had expired, without providing any findings of fact or conclusions of law to justify or explain his decision, and without extending adequate due process to plaintiffs constitutes the requisite "affirmative misconduct" [to impose equitable estoppel against the government]. Further affirmative misconduct occurred in the Assistant Secretary filing a pleading in federal court one day and the next day taking the very opposite position, especially after having not reviewed any significant portion of the administrative record.[[4/]]

---

[4/] In *Rosebud I*, Secretary Babbitt and Assistant Secretary Gover filed their Answer on January 26, 1999 denying any NEPA or NHPA violations. Gover's letter declaring the lease void for failure to comply with NEPA was dated one day later.

(continued...)

104 F. Supp. 2d at 1205. This affirmative conduct warranted the "rare" imposition of equitable estoppel, binding the government to its FONSI and subsequent lease approval, representations of material facts upon which Sun Prairie relied upon to its detriment.

> It is high time that the BIA conduct its affairs in a timely and business-like manner to give confidence to Tribes, all Native Americans, their business partners, and lending institutions so that they can rely upon the BIA to do what they say they are going to do. The principles of equity dictate that the Assistant Secretary's decision cannot be upheld.

104 F. Supp. 2d at 1206.

Gover's "void" letter "fail[ed] to identify any specific shortcomings of the EA or offer any reasonable basis for requiring the preparation of an EIS," *id.*, so the court undertook the inquiry, holding that the voiding of the Lease was arbitrary and capricious. Under NEPA, an EIS is not required if the agency determines there will not be a significant effect on the human environment. 104 F. Supp. 2d at 1206-07, citing 42 U.S.C. § 4332(2)(C), 42 C.F.R. §§ 1501.4(b), 1508.9(b) and 1508.13. Applying an arbitrary or capricious standard to the administrative record, the court placed the burden on the challengers to raise "a substantial environmental issue" that was not considered. *Id.* at 1207. Although witnesses for intervenors, Concerned Citizens, "were certainly people of good faith with honestly held convictions[, they presented nothing] to substantiate any claim of environmental harm. The defendants called no witnesses at all. The witness from the EPA admitted that she was 'out of the loop.' She admitted that as the project is now designed and will apparently be operated, there would be no environmental harm." *Id.* at 1208.

The *Rosebud II* court continued, finding the EA adequately described soil types in the Project area; the impact on water supply was determined to be less than negligible; and design and mitigation measures would adequately reduce the significance of water contamination. In sum, the EA and the administrative record "adequately identified and detailed the impacts of the project on the environment." *Id.* at 1209-10. EPA failed to comment within the required period and the tardy comments "lacked familiarity with many details of the project and mitigation

---

[4/](...continued)

measures." *Id*. at 1211. Argument that the property was eligible for listing in the National Registry because of the "Historic Indian Trail" was dispelled by the record. A survey of the entire property was performed and no areas of significance were found. The court noted that even if the land qualified for a National Registry listing, that alone would not require the preparation of an EIS. *Id.* at 1212. Intervenors also failed to establish an adverse impact on endangered or threatened species. Judge Kornmann concluded that the administrative record was to the contrary, citing a September 18, 1998 letter from the U.S. Fish and Wildlife Service that construction would not likely adversely affect the bald eagle or the black-footed ferret, cited as possible victims of the development. *Id.* Finally, the court concluded the mitigatory measures in the project design were sufficient to support the FONSI. *Id*. at 1212-13. In the end, *Rosebud II* held the "decision to forego an EIS was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* at 1213. Having found no substantive violations, *Rosebud II* then rejected claims of procedural violations. Even if, as alleged, notice was not properly given, no prejudice was established. *Id.*

Judge Kornmann recognized the prejudice to Sun Prairie which reasonably relied on the Lease and expended millions in construction costs. "Relying on the lease approval, Sun Prairie invested $5,000,000 on construction of phase I. Moreover, the bank financing for the project was linked to other ventures and the ramifications of the Assistant Secretary's decision threatened great and irreparable harm to Sun Prairie's established business reputation as well as that of the Tribe." 104 F. Supp. 2d at 1206.

The court permanently enjoined the government and Concerned Citizens from interfering or attempting to interfere with the Lease:

> Bruce Babbitt and Kevin Gover, and their employees, agents, and representatives, and the intervenors, [Concerned Citizens], and their employees, agents, and representatives are expressly restrained, enjoined and prohibited from taking any actions, other than seeking relief by appeal or other appropriate judicial relief, which actions would have the purpose or consequence of interfering or attempting to interfere with the construction or operation of the project that is the subject of this action.

104 F. Supp. 2d at 1213-14.

The government and intervenors, Concerned Citizens, appealed *Rosebud II* to the United States Court of Appeals for the Eighth Circuit. Shortly after Judge Kornmann's February 3, 2000 Opinion, the newly-elected Tribal Council, opposed to the Project, was granted leave by the Eighth Circuit to "switch sides" and realign its position on appeal to join the government in contesting Judge Kornmann's permanent injunction. That left Sun Prairie as the lone defender of Judge Kornmann's Decision. Subsequently, on April 5, 2002, without reaching the merits, the Eighth Circuit held that Sun Prairie lacked standing to challenge the BIA's decision to void the lease, vacated the permanent injunction and remanded the matter to the district court to dismiss the complaint for lack of jurisdiction. *Rosebud Sioux Tribe v. McDivitt*,[5/] 286 F.3d 1031 (8th Cir. 2002), *reh'g and reh'g en banc denied* (Aug. 14, 2002), *cert. denied,* 537 U.S. 1188 (2003) ("*Rosebud III*").

Several months after the Eighth Circuit opinion, on August 14, 2002, Sun Prairie filed suit in the United States District Court for the District of South Dakota, Central Division, against the Secretary of the Interior and the Tribe. This is the first of the *Rosebud* series in which damages were sought directly against the Tribe. Injunctive and declaratory relief as well as monetary damages were sought. *Sun Prairie and Bell Farms v. McCaleb, Norton*[6/] *and Rosebud Sioux Tribe*, No. 02-3030 ("*Rosebud IV*"). (Marshall Aff. Ex. H.) Concerned Citizens intervened on January 26, 2003. Sun Prairie alleged that, in reliance on a lease duly approved by the Tribal Council and the BIA, construction of one of the planned "finishing barns"[7/] (the "Grassy Knoll farm") was completed in 1999 at a cost of approximately ten million dollars. The Complaint in *Rosebud IV* asserts that no party sought a stay of Judge Kornmann's permanent injunction in *Rosebud II* pending appeal. Accordingly, Sun Prairie commenced construction of the second production site – the Cottonwood Grove farm. At that time, the *Rosbud IV* Complaint continues, the Tribe engaged in affirmative and actionable conduct to interfere with and delay construction, including (1) failing to supply water as contractually required; (2) enacting onerous fees that

[5/]McDivitt, appointed Acting Secretary of Indian Affairs, was substituted as a party.

[6/] Neal McCaleb was the Assistant Secretary for Indian Affairs for the Department of Interior. Gail Norton was the Secretary.

[7/]"Finishing" refers to the period just prior to slaughter when pigs are typically fed rations of grain or other concentrates to increase weight and produce desirable carcass characteristics.

applied only to Sun Prairie and prevented private source water use; (3) refusing to review design plans or process construction applications; (4) declining to participate in meetings with governmental officials to review sample data on the performance of the Project manure digester, after complaining that it was not working properly; (5) issuing a stop-work order on the Cottonwood Grove farm site based on erroneous claims of non-compliance; and (6) obtaining an *ex parte* stop work order from the Tribal Council on April 24, 2001.

Asserting the Tribe was in violation of the permanent injunction of *Rosebud II*, on April 27, 2001 – three days after the Tribal stop work order (and prior to the Eighth Circuit order in *Rosebud III* vacating the permanent injunction), Sun Prairie filed a motion for a show cause order with the *Rosebud II* court. As detailed in the *Rosebud IV* Complaint, on May 18, 2001, after a hearing, Judge Kornmann found the Tribe acted "in bad faith to obstruct the Project" and "issued an order confirming that the permanent injunction applied to the Tribe, and prohibiting any further conduct in violation of the injunction." (Marshall Aff. Ex. H ¶¶ 36, 41.) Sun Prairie had obtained some $40 million in financing to construct and operate the Grassy Knoll and Cottonwood farm sites, secured in part on leasehold mortgages and some $5 million in subordinated debt. The conduct of the Tribe and the federal defendants "has placed Sun Prairie at risk of default on the Rosebud Project term and operating loans totaling approximately $40 million, on more than $5 million in subordinated debt, and on various cross-collateralized loans." (*Id.* ¶ 45.) The *Rosebud IV* Complaint also avers that Sun Prairie was obligated to purchase all of the pigs farrowed[8/] by a Colorado pig grower (estimated at 96,000 annually at the two Rosebud Sioux units), and had contracted with a packing company to deliver 525,000 finished slaughter hogs annually. Without the Rosebud Project, Sun Prairie would be unable to fill these contractual commitments and would suffer consequentially. Other damages included increased construction costs and harm to business reputation.

The *Rosebud IV* Complaint also asserts that, following the Eighth Circuit's dismissal in *Rosebud III*, the Tribe "threat[ed] to immediately discontinue water and utility services to the Project and to deny Sun Prairie access to the Rosebud farms in light of the Eight [sic] Circuit's decision of April 5, 2002 [*Rosebud III*] . . . [and] BIA representatives have stated that the Land Lease is ineffective and that the BIA will

[8/]Farrowing is the birth of a litter of pigs.

not act to resolve the dispute notwithstanding the Bureau's obligation under 25 C.F.R. Part 162 to administer leases of reservation lands." (*Id*. ¶¶ 57, 58.)

Several Counts of the Complaint in *Rosebud IV* are directed to only the Tribe, including Count Five (seeking a declaratory judgment that the Tribe is bound by the Land Lease); Count Six (breach of contract); Count Seven (impairment of contract); Count Eight (promissory estoppel); Count Nine (unjust enrichment)[9/]; and Counts Ten through Twelve (interference with contracts). Requested relief against the Tribe includes monetary damages.

In *Rosebud IV*, in a twenty-one page opinion filed on June 5, 2003, District Judge Battey denied motions to dismiss by both the federal defendants and the Tribe. In so doing, Judge Battey, echoing the findings of Judge Kornmann, determined that Gover's purported voiding of the Land Lease was invalid for failure to comport with governing regulations and procedures. Claims of environmental non-compliance, even if true, could have been remedied. Sun Prairie, the lessee, had the procedural right to be notified and given an opportunity to cure.

> [T]he federal defendants filed [an] answer in the D.C. litigation denying that Sun Prairie had failed to comply with environmental compliance requirements. Defendants' and intervenor's argument that Sun Prairie's environment compliance is deficient is a matter of opinion, and a subject of dispute between opposing parties with divergent political agendas. One tribal council's economic development opportunity is another tribal council's land "rape;" it is the rule of law that prevents such competing policy objectives from degenerating into anarchic disruption. Sun Prairie submitted its project to a NEPA environmental compliance study conducted by a consultant hired not by it, but by the BIA. The only environmental finding of record in this case that is the product of any due process is that of the BIA's consultant, which found Sun Prairie's environmental compliance appropriate. Thus approved through appropriate legal process, and with the encouragement of the tribe, Sun

---

[9/] The Tribe received an initial payment of $100,000 from Sun Prairie as well as subsequent lease payments. Significant physical improvements were constructed on reservation land and Tribal members were employed during the construction and operation of the sites.

> Prairie invested tens of millions of dollars into its hog farming enterprise.

(Marshall Aff. Ex. G 14.)

Facts alleged "suggest ulterior motives underlying the tribe's legal constructs" (*id.* at 16) and "it appears that the Secretary's decision has served as a pretext for the tribe's breaching conduct." (*Id.*) Nevertheless, "[w]hat is undisputed is that the duly authorized tribal authorities approved the lease in 1998." (*Id.*) Judge Battey concluded Secretary Gover's purported termination of the lease was ineffective and the lease was valid.

> While it may have been expedient for the government to terminate the lease to settle a lawsuit with intervenors, plaintiffs' rights were a casualty of that expediency. The secretary's lease termination did not comply with applicable federal due process regulations. The lease, accordingly, is valid, and its terms control the Court's analysis of the pending motions to dismiss.

(Marshall Aff. Ex. G 9.)

After denial of the motion to dismiss, Sun Prairie moved for summary judgment. While the summary judgment motion is not readily apparent in the record, according to the Complaint in the instant matter, "[o]n February 22, 2005, the Tribe held a Tribal Council meeting at which Assistant Attorney General Thomas Sansonetti appeared by telephone. During the telephone conference the Assistant Attorney General advised the Tribe that the United States would not resist Sun Prairie's motion for summary judgment and in effect, confess judgment if the Tribe did not settle the case." (Compl. ¶ 38.) Subsequently, on May 19, 2005, a Judgment by Consent and Order was entered which included significant amendments to the Lease. (Marshall Aff. Ex. F.) Sun Prairie would not build any more facilities under the Land Lease and would operate the existing Project production facilities for no more than 15 years at which time the Tribe has an option to purchase the buildings, fixtures and improvements for 50 percent of their then fair market value according to a formula. If the Tribe does not exercise its option, Sun Prairie could extend the lease for five years and in that event, the termination provisions in the original lease would apply. Sun Prairie pays $60,000 per year per farm and additional amounts for water.

The BIA pays $85,000 to Sun Prairie for a well; Sun Prairie makes a one-time payment of $131,000 to the Tribe. Other provisions include Sun Prairie's agreement to implement certain environmental measures in consultation with the EPA. Remaining terms of the Lease not inconsistent with the Consent Judgment would govern. With certain limitations, the parties agreed there would be no further litigation over the validity of the lease. The Judgment voided the Gover letter. A June 5, 2003 Order of that court based on the stipulation of the parties, affirmed the validity of the Lease as modified in the Consent Judgment. While reciprocal releases were exchanged between Sun Prairie and the government and Tribe, any trust claims between the Tribe and the government remained. "This Consent Judgment does not alter or diminish in any way the trust responsibilities of the United States to the Tribe regarding the land that is the subject of the Lease." (Marshall Aff. Ex. F 11.)

There is yet another lawsuit. On June 24, 2005, Concerned Citizens, brought suit in the United States District Court for the District of Columbia against Gail Norton, Secretary of the Interior and James Cason, Acting Secretary for Indian Affairs ("*Rosebud V*"). (Marshall Aff. Ex. A.) The Complaint seeks declaratory relief that the BIA's "recent re-approval of the lease" was "illegal" and that defendants violated NEPA by failing to prepare an EIS. The Tribe is not a party. Defendant moved to dismiss on mootness grounds. On March 30, 2006, *Rosebud V* was transferred to the South Dakota District Court upon the defendants' Motion to Dismiss or for Change of Venue. Judge Robertson's Memorandum Order granted the venue change, "[b]ecause only the District Court for the District of South Dakota can say whether plaintiff's claims are truly moot." (Marshall Aff. Ex. B 1.) The Order noted that neither the Tribe nor Sun Prairie were parties to *Rosebud I*. *Rosebud V* seeks essentially the same relief as *Rosebud I*, that is a declaration that defendants violated NEPA. Defendants' motion to dismiss in *Rosebud V* asserted the dispute was moot. Because under the Consent Judgment of *Rosebud IV*, there would be no further construction, Judge Robertson agreed, citing with approval authority that completion of a project moots claimed NEPA violations. However, because of the history of inconsistent positions and decisions:

> [t]he case is truly moot, however, only if the consent judgment entered by the District Court for the District of South Dakota is not susceptible of being vacated as BIA's stipulation in this court was vacated. It was the District Court for the District of South Dakota that un-settled the case that was settled here and entered the consent judgment approving

> the fait accompli on the Tribe's land. That court should decide whether the claims of these plaintiffs are moot.

(Marshall Aff. Ex. B 5-6.) Following transfer, *Rosebud V* was pending in the South Dakota District Court, Central Division, assigned to Judge Battey. (Marshall Aff. Ex. C.) On December 13, 2006, the case was dismissed without prejudice for failure to prosecute. *See* Dkt. *Concerned Rosebud Area Citizens, et al. v. Norton, et al.,* No. 06-03009 (D.S.D.) (available on Westlaw).

Before the undersigned is *Rosebud VI.* Plaintiff's Complaint alleges that the Secretary of Interior breached fiduciary duties owed to the Tribe in the handling of the various lawsuits, vacillating between conceding the lease was void and valid, resulting in a determination by more than one United States District Court that the lease was valid and another that lease was invalid. The waiver of sovereign immunity in the lease is also alleged to be a breach of fiduciary duty. Damages alleged include the cost and expense of defending litigation related to the Land Lease and the Tribe's exposure to damages in *Rosebud IV*, the case that resulted in the Consent Judgment. (Compl. ¶42.)

Defendant's Motion for Judgment on the Pleadings alleges:

> (1) plaintiff's claims for breach of fiduciary duty in connection with both the approval of the lease and its subsequent voiding are barred by the statute of limitations, and/or laches;
>
> (2) plaintiff's claims are an impermissible collateral attack on a final consent judgment and should be dismissed for lack of subject matter jurisdiction; and
>
> (3) plaintiff's Complaint fails to identify a statutory or regulatory provision that can fairly be interpreted to mandate compensation; therefore, this court lacks subject matter jurisdiction.

**<u>Standards for motion for judgment on the pleadings</u>**

Defendant's motion is made pursuant to RCFC 12(c) which provides that, "[a]fter the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings." Matters outside the pleadings are

referenced by both parties. Since "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56."

"The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss." *Peterson v. United States*, 68 Fed. Cl. 773, 776 (2005). In considering a motion to dismiss, the court "must accept as true all of plaintiff's well-pleaded facts alleged in the complaint and draw all reasonable inferences in the Plaintiffs' favor." *Id.* at 775 (citations omitted). A Complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 775 (citing *Scheuer v. Rhodes*, 416 U.S. at 236-37 (1974)). Where, as here, for the purposes of its motion, defendant does not challenge the truth of the facts alleged by plaintiff (and vice versa), the court accepts them as true. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir. 1988); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (in determining such motions, courts are obligated "to draw all reasonable inferences in plaintiff's favor").

Defendant's Motion includes a challenge to subject matter jurisdiction, which while typically raised in a Rule 12(b)(1) motion, may, after the filing of an Answer, be raised in a motion for judgment on the pleadings. In considering a jurisdictional challenge, the court "is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings." *Cedars-Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).

**Statute of limitations and laches**

The parties dispute whether the statute of limitations challenge is one of jurisdiction or of failure to state a claim. This threshold inquiry allocates the burden of proof in this regard. If jurisdictional, plaintiff has the burden, *Reynolds v. Army & Air Force Exchange Service,* 846 F.2d 746, 747-48 (Fed. Cir. 1988), while defendant has the burden on a motion to dismiss. *Bolduc v. United States*, 72 Fed. Cl. 187, 191(2006). The Tribe relies on *Bolduc* (citing Federal Circuit authority that the statute of limitations is not jurisdictional). Defendant cites the more recent (and binding) *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345 (Fed. Cir.), *pet. for reh'g denied* (Nov. 30, 2006) which holds that the statute of limitations is jurisdictional to this court. Regardless of where the burden lies, however, even if

plaintiff has the burden, at least some claims fairly stated in the Complaint are not barred by the statute of limitations.

The governing statute of limitations, 28 U.S.C. § 2501, provides: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." The Indian Long-Term Leasing Act, 25 U.S.C. § 415(a), also cited by the parties, does not contain a separate statute of limitations. "[S]tatutes of limitations are to be applied against the claims of Indian tribes in the same manner as against any other litigant seeking legal redress or relief from the government." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576 (Fed. Cir. 1988). The Tribe's Complaint was filed on September 23, 2005. Therefore, the Tribe must establish by a preponderance of the evidence, claims that accrued after September 23, 1999. *Baka v. United States*, _ Fed. Cl. _, 2006 WL 3474582 (Nov. 29, 2006) (citing *Entines v. United States*, 39 Fed. Cl. 673, 678 (1997).)

BIA's initial approval of the lease in 1998; the January 27, 1999 Gover letter "voiding" that approval; the filing of the *Rosebud I* Complaint on November 23, 1998 as well as the Order approving the Stipulated Dismissal on February 1, 1999; the February 3, 1999 commencement of *Rosebud II* and preliminary injunctive relief granted by Judge Kornmann, are all events beyond the statutory period. Neither the Consent Judgment in *Rosebud IV* approved by Judge Battey on May 19, 2005, nor his ruling that Gover's extra purported termination of the lease was invalid, is outside the statutory period. While Gover's purported voiding of the lease is outside the statute of limitations, the subsequent inconsistent positions taken by the BIA, which allegedly forced the Tribe into the Consent Judgment with Sun Prairie, and may result in other damages, are not.

The Tribe also argues that there is no cause of action for breach of trust or fiduciary duty until (1) there is a breach; and (2) the trust beneficiary – the Tribe – suffers damages. Therefore, even though some alleged agency actions may have occurred, or damages may have been incurred, more than six-years prior to the filing of the Complaint, other actions and damages may not.

"It is hornbook law that a claim does not accrue until all events necessary to fix the liability of the defendant have occurred – when 'the plaintiff has a legal right to maintain his or her action.'" *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993) (citing Corman, *Limitation of Actions*, § 6.1, p. 374

(1991)). "It is too well established to require citation of authority that a claim does not accrue until the claimant has suffered damages." *Terteling v. United States*, 167 Ct. Cl. 331, 338, 334 F.2d 250, 254 (1964). The government contract in *Terteling* granted the contractor the right to extract gravel from a specific pit. Unfortunately, that pit was owned by another who sued the contractor for unauthorized extraction. Subsequently, the contractor sought to recover its expense and damages from the government. The government claimed that the statute of limitations began to run from the date of the final contract payment. The court rejected that position. "It was only when the litigation ended that the contractors could determine the total amount of litigation expenses. . . ." *Id. See also Nw. La. Fish & Game Preserve Comm'n v. United States,* 446 F.3d 1285, 1291 (Fed. Cir. 2006); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). *Cf. Catawba Indian Tribe,* 982 F. 2d at 1570-71 (rejecting Tribe's claim that action did not accrue until United States Supreme Court announced the effect of a Congressional Act that breached government promises that Tribal lands would be preserved, concluding that the limitations period commenced with the passage of the unambiguous statute). Also in this regard, "[b]eneficiaries of a trust are permitted to rely on the good faith and expertise of their trustees; because of this reliance, beneficiaries are under a lesser duty to discover malfeasance relating to their trust assets." *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1347 (Fed. Cir. 2004), *cert. denied,* 544 U.S. 973 (2005).

The Tribe's claimed damages include litigation expenses. From the submissions, it is apparent that at least some alleged damages were incurred within the statutory period. In this regard, Plaintiff 's *Rosebud VI* Complaint includes acts on both sides of the statute of limitations. The Complaint alleges:

> 40. The Secretary and the United States breached their fiduciary duty to the Tribe by the manner in which the United States approved the land Lease, declared the approved Land Lease "void" and threatened to once again declare the Land Lease valid, exposing the Tribe to monetary damages if the Tribe did not settle the Sun Prairie Litigation [referring to *Rosebud IV*].
>
> . . .
>
> 42. As a result of the Defendants' breach of their fiduciary duty the Tribe has suffered damages including but not limited to the cost and

> expense of defending litigation related to the Defendant[']s Lease approvals.

(Compl. 6.)

Although not addressed by the parties, the continuing claims doctrine may also serve to insulate claims from the statutory bar. "The continuing claims doctrine operates to save later arising claims even if the statute of limitations has lapsed for earlier events." *Hayes v. United States*, 73 Fed. Cl. 724, 729 (2006) (citing *Ariadne Fin. Servs. Pty. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998)). "'In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages.'" *Id.* (quoting *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997)). The continuing claim doctrine however, does not apply to "'a claim based upon a single distinct event, which may have continued ill effects later on." *Id*. (quoting *Brown Park Estates*, 127 F.3d at 1456). "[T]he claim will not be barred provided that at least one wrongful act occurred during the statute of limitations period and that it was committed in furtherance of a continuing wrongful act or policy or is directly related to a similar wrongful act committed outside the statute of limitations." *Felter v. Norton*, 412 F. Supp. 2d 118, 125 (D.C. Cir. 2006) (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997). "The continuing violations occurring within the statute of limitations must be actual acts committed, rather than merely effects of prior acts." *Id*. (citing *Guerra v. Cuomo*, 176 F.3d 547, 551 (D.C. Cir. 1999). *See Mitchell v. United States*, 13 Cl. Ct. 474, 479-80 (1987) (noting continuing claim doctrine would apply to 25 U.S.C. § 466 which created ongoing governmental duty to regenerate the forest, so that each year that went by without replanting created a new cause of action; denying application of doctrine to claim the government failed to obtain fair compensation for a right-of-way because the duty to obtain fair compensation arose only once).

It cannot be said at this early stage of the litigation that the Complaint does not, or could not, encompass claims that are not barred by the statute of limitations, and factual issues in this regard preclude summary dismissal. Similarly, grounds for dismissal of all claims on the basis of laches were not established. The Tribe's request for attorney fees and expenses in the *Rosebud* action are amounts only recently liquidated. *See Mitchell v. United States*, 13 Cl. Ct. at 484 (1987) ("All

events that gave rise to the claim obviously could not have occurred until the settlement occurred. Since the settlement took place within six years of the filing of this suit, the claim is not time-barred."). Prejudice alleged by the government necessary to invoke laches includes the Tribe's receipt of substantial sums from Sun Prairie (some $60,000 to $75,000 per year per site as well as compensation for water usage). These sums were not paid by the government, so do not satisfy the prejudice requirement. Possible government reluctance to settle future litigation because of fear of possible claims of breach of duty, is a matter that may be revisited.

It is, however, prudent that issues be refined to the extent feasible. Accordingly, as part of the pretrial proceedings in this case, and to allow for focused parsing, plaintiff shall identify, date and detail each claim, the legal theories, factual bases and corresponding damages. *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 52 Fed. Cl. 614, 616 (2002).

**Impermissible collateral attack**

Defendant asserts that the Tribe's claim of breach of fiduciary duty incident to the Consent Judgment is a impermissible collateral attack on that final judgment. As previously noted, the government fears a chilling effect on its willingness to compromise Native American claims, if a tribe independently represented by counsel, can later claim breach of trust alleging it was strong-armed by the government to accept settlement. Here however, plaintiff does not seek to set aside the substance of the Consent Judgment. Also, the record indicates the Consent Judgment specifically preserved any claims between the Tribe and the government, matters of breach of trust over which the District Courts in South Dakota would not have had jurisdiction. *See United States v. Navajo Nation*, 537 U.S. 488 (2003) (Tucker Act and Indian Tucker Act confer jurisdiction upon Court of Federal Claims with rights-creating source of substantive law that can be fairly interpreted as mandating compensation by federal government for damages); *Brown v. United States*, 86 F.3d 1554 (Fed. Cir. 1996) (applying jurisdiction in this court for breach of fiduciary obligations respecting commercial leasing of tribal lands); *LeBeau v. United States*, 171 F. Supp. 2d 1009 (D.S.D. 2001) (recognizing jurisdiction over Indian breach of trust claims under the Little Tucker Act). Accordingly, judgment on the pleadings on this grounds is not warranted.

**Money-mandating**

The government also argues that even if plaintiff has claims that are not barred by the statute of limitations or laches, this court has no jurisdiction over them because plaintiff failed to identify a breach of a statute or regulatory provision that, fairly interpreted, mandates compensation. The Tucker Act (28 U.S.C. § 1491) and the Indian Tucker Act (28 U.S.C. § 1505)[10] waive the United States' sovereign immunity as to claims within their scope. *United States v. Mitchell*, 463 U.S. 206, 211-16 (1983) ("*Mitchell II*"). The Tucker Act, however, "is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). To satisfy jurisdictional requisites, a plaintiff must either demonstrate he or she has an "express or implied contract with the United States," 28 U.S.C. § 28, or point to some substantive law that "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Testan*, 424 U.S. at 400 (quoting *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 372 F.2d 1002, 1009 (1967) (the "fair interpretation standard"). No contract is alleged here. Accordingly, jurisdiction depends upon a money-mandating source.

Defendant summarizes the Tribe's four-fold alleged breaches in the instant Complaint as: (1) approving the original Lease; (2) declaring the Lease void; (3) "'threatening to once again declare the Land Lease valid, exposing the Tribe to monetary damages if the Tribe did not settle the Sun Prairie litigation;'" and (4) "approving the original Lease which contained a waiver of the Tribe's sovereign immunity." (Def.'s Mot. for J. on the Pleadings 22 (citing Compl. ¶ 40).) These are not statutory or regulatory violations, defendant asserts, nor do they have a money-mandating origin, accordingly, this court lacks jurisdiction and dismissal is appropriate.

In response, plaintiff relies upon the general trust and fiduciary responsibility between the Tribe and the federal government, and particularly, the authority and

[10] The Indian Tucker Act, passed in 1946, granted Native Americans access to the United States Court of Federal Claims in the same manner as the Tucker Act. The two Acts are congruous, differing only in eligible claimants. *See* Gregory C. Sisk, *Symposium: The Indian Trust Doctrine After the 2002-2003 Supreme Court Term - Yesterday and Today: Of Indians, Breach of Trust, Money, and Sovereign Immunity*, 39 Tulsa Law Review 313 (2003).

comprehensive control exercised by the BIA over leasing of tribal lands, from which liability for monetary damages for breach of that responsibility can be reasonably inferred.

Defendant disagrees that the provisions cited are money-mandating, and counters that the government acts alleged are within statutory and regulatory authority and thus could not be breaches of any trust or fiduciary responsibilities.

The framework for determining the existence and scope of any fiduciary duty established in statute, regulation or contract and whether such is money-mandating, is addressed in *Mitchell I* and *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*"), and more recently in *United States v. White Mountain Apache Tribe,* 537 U.S. 465 (2003) ("*White Mountain Apache*") and *United States v. Navajo Nation*, 537 U.S. 488 (2003) ("*Navajo Nation*"). *See Navajo Nation*, 537 U.S. at 503 (noting that "*Mitchell I* and *Mitchell II* are the pathmarking precedents" in determining the existence of a money-mandating duty); *Wopsock v.* Natchees, 454 F.3d 1327, 1332 (Fed. Cir. 2006); *Fisher v. United States*, 402 F.3d 1167, 1173-74 (Fed. Cir. 2005) (reviewing the standards in *White Mountain Apache* and *Navajo Nation* regarding whether a duty is money-mandating); *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 58 Fed. Cl. 77, 81 (2003) (noting that "[t]he framework within which this dispute must be resolved" was restated in *Navajo Nation* and *White Mountain Apache*).

In *Mitchell I*, individual Indian allottees of land in the Quinault Reservation sought monetary damages from the government for failure to properly manage timber resources on that land, an alleged breach of fiduciary duty under the General Allotment Act of 1887 ("GAA"). 445 U.S. at 537. From the language of the GAA and its legislative history, the Supreme Court determined it was the intent of Congress that the government hold the land in trust "to prevent alienation of the land" and to avoid state taxation of allotments. *Mitchell I*, 445 U.S. at 544. Management of the allotments was left to the allottees, not to the trustee. *Id*. at 543. Accordingly, the Court concluded that the GAA created only a limited trust relationship and "cannot be read as establishing that the United States has a fiduciary responsibility for management of allotted forest lands." *Id*. at 546. However, the Court remanded to the Court of Federal Claims to determine whether another statutory or regulatory source of duty, perhaps broader, could be found. *Id.* at 546 n.7.

On remand, a broader substantive source was found in timber management statutes and regulations, and in *Mitchell II*, the Supreme Court affirmed the finding of a broad fiduciary responsibility. "The timber management statutes and the regulations promulgated thereunder establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of tribal timber." 463 U.S. at 222 (citations omitted). These responsibilities "directly support[] the existence of a fiduciary relationship," *id.* at 224, and "the statutes and regulations at issue here can fairly be interpreted as mandating compensation by the Federal Government for violations of its fiduciary responsibilities." *Id.* at 228. "Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Id.* at 226. Although the substantive law that established these duties did not expressly provide for compensation upon breach, the Court noted that "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication.'" *Id.* at 217 n.16 (citing *Eastport S.S. Corp.*, 372 F.2d at 1007).

The Supreme Court revisited the *Mitchell II* "fair interpretation"standard some twenty years later in a case involving the government's alleged failure to maintain the former Fort Apache Military Reservation which it held in trust for the White Mountain Apache Tribe. In *White Mountain Apache*, the Court concluded the substantive statutes and regulations went beyond the "bare" or limited trust presented in *Mitchell I* by "invest[ing] the United States with discretionary authority to make direct use of portions of the trust corpus." 537 U.S. at 475. If statutes, regulations, or conduct of the government of management and/or control are "beyond the 'bare' or minimal level . . . [then they] could 'fairly be interpreted as mandating compensation' through money damages if the Government faltered in its responsibility." 537 U.S. at 474 (citing *Mitchell II*, 463 U.S. at 223-26). "It is enough, then, that a statute creating a Tucker Act right be **reasonably amenable** to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred,' a **fair inference** will do." *Fisher*, 402 F.3d at 1174 (citing *White Mountain*, 537 U.S. at 472-73).[11/]

---

[11/] While *Fisher* notes that it is "less than clear" whether *White Mountain* relaxed the "fairly interpreted test, 402 F.3d at 1174, application of either standard would not alter the court's conclusions herein.

In contrast, in an opinion interpreting the Indian Mineral Leasing Act handed down on the same day as *White Mountain Apache*, the Court was unable to find in the statutes and regulations governing coal mining leases the requisite "rights-creating or duty-imposing statutory or regulatory prescriptions" that could "fairly be interpreted as mandating compensation by the Federal Government for the damages sustained" when the government approved a royalty rate that exceeded the statutory minimum. *Navajo Nation*, 537 U.S. at 503. The Court concluded that "no provision of the [governing statute] or its regulations contains any trust language with respect to coal leasing." *Id*. at 508. While the Secretary of the Interior was required to approve leases negotiated between the Navajo Tribe and a third party, the approval function did not include an obligation to ensure a rate of return higher than the minimum specified in the regulations. *Id*. at 510-11. The rate negotiated and incorporated in the lease approved by the Secretary exceeded the regulatory floor. *Id*. at 510. As the lease complied with statutes and regulations then in effect, and absent any other duty to maximize the return to the Navajo Tribe from its coal leases, as in *Mitchell I*, the Court found that the government did not breach any money-mandating fiduciary duty. *Id*. at 514 ("[W]e have no warrant from any relevant statute or regulation to conclude that his conduct implicated a duty enforceable in an [action] . . . for damages under the Indian Tucker Act.").

Here, the government controls the leasing of tribal lands. The Secretary of Interior must approve leases. 25 U.S.C. § 81(b)(2001) ("No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary."). Commercial leases may not exceed twenty-five years, and before approval, the Secretary has to consider any impact on neighboring lands, the safety of the structures to be built on the leased land and the effect on the environment.

> **Lease of restricted lands for public, religious, educational, recreational, residential, business and other purposes; approval by Secretary**
>
> **(a) Authorized purposes; term; approval by Secretary**
>
> Any restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, with the approval of the Secretary of Interior, for public, religious, educational, recreational, residential, or

> business purposes, including the development or utilization of natural resources in connection with operations under such leases, for grazing purposes, and for those farming purposes which require the making of a substantial investment in the improvement of the land for the production of specialized crops as determined by said Secretary. All leases so granted shall be for a term of not to exceed twenty-five years.... Prior to approval of any lease or extension of an existing lease pursuant to this section, the Secretary of the Interior shall first satisfy himself that adequate consideration has been given to the relationship between the use of the leased lands and the use of neighboring lands; the height, quality, and safety of any structures or other facilities to be constructed on such lands; the availability of police and fire protection and other services; the availability of judicial forums for all criminal and civil causes arising on the leased lands; and the effect on the environment of the uses to which the leased lands will be subject.

25 U.S.C. § 415(a).

25 C.F.R. Part 162 includes requirements that: (1) all leases be approved by and in a form approved by the Secretary; (2) rent must be at no less than fair market value unless the Secretary determines it would be in the best interest of the Tribe; (3) a surety bond must be filed in most instances; (4) no advance rent may be required except as approved by the Secretary; (5) the lease can require rental be paid directly to the Secretary; (6) all obligations of lessees run to the United States as well as the land-owner; (7) the lessee must agree not to use any part of the leased premises for unlawful purposes; (8) leases for farming operations must require "principles of good practice and prudent management. Land use stipulations or conservation plans necessary to define such use shall be incorporated in and made a part of the lease," 25 C.F.R. § 162.11 (1998); (9) with certain exceptions, any sublease, assignment, amendment or encumbrance must be approved by the Secretary; (10) the lessee can encumber the leasehold interest only with the Secretary's approval; (11) upon a showing to the Secretary of any lease or regulatory violation, the lessee is given notice and an opportunity to cure; (12) if the lease is cancelled, the lessee must be

given notice of appeal rights; and (13) any damages for claimed breaches must be approved by the Secretary. 25 C.F.R. § 162.1-14 (1998).[12/]

Additionally, provisions of the Lease that implicate the Secretary either directly or indirectly include: (1) a recitation that the Tribe had authority to enter the Lease with the consent of the Secretary; (2) any leasehold mortgages had to be approved by the Secretary and provide that the Secretary receive notice of any default; (3) the Secretary must consent to any assignment of leasehold interest; (4) a recitation that title to the property is held by the United States in Trust for the Tribe; (6) the lessee's obligations extend to the United States; and (7) the lessee's reclamation plan must meet the Secretary's standards. (Marshall Aff. Ex. H Part 2).

Examining the same statutory and regulatory provisions governing leasing of Tribal lands now before this court, in *Brown v. United States*, 86 F.3d 1554 (Fed. Cir. 1996), the Federal Circuit held that the BIA's statutory and regulatory constraints over the conveyances of tribal lands under the Indian Leasing Act was sufficient "control" for Tucker Act purposes, finding that conclusion mandated by *Mitchell II.* "[B]y virtue of the control they place in the hands of the Secretary, Section 415(a) and the implementing regulations of part 162 imposed upon the government a fiduciary duty in the commercial leasing context." *Id*. at 1563. "[T]he Secretary acts as a fiduciary with respect to leases granted under 25 U.S.C. § 415(a)." *Id*.

Accordingly, "[g]iven the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." 86 F.3d at 1563 (quoting *Mitchell II*, 463 U.S. at 226). However, the existence of a general fiduciary duty or trust relationship does not *ipso facto* validate any lease-related claim by the Tribe. "The validity of a breach of trust claim grounded on section 415(a) must be assessed according to the general principle that 'the scope and extent of the fiduciary relationship' alleged to have been breached 'is established by the regulations' that control this type of leasing." *Brown*, 86 F.3d at 1563 (quoting *Pawnee*, 830 F.2d at 192 and citing *Mitchell II*, 463 U.S. at 224).

---

[12/] The court notes the substantial amendments to 25 C.F.R., Part 162. on January 22, 2001. However, unless otherwise noted or discussed in a case concerning pre-amendment regulations, the court will refer to the regulations in effect in 1998 when the Lease was approved.

Also, assumption of control was cited both in *Mitchell II* and *White Mountain Apache* as an additional basis for imposition of fiduciary responsibilities. If the statutes or regulations permit control, and control is taken, fiduciary responsibilities follows. Quoting favorably from the Court of Federal Claims opinion, *Mitchell II* summarized the creation of an actionable fiduciary responsibility by governmental exercise of control:

> [W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Mitchell II*, 463 U.S. at 225 (quoting *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 987 (Ct. Cl. 1980) (internal quotations omitted)). *See also Shoshone Indian Tribe of Wind River v. United States*, 52 Fed. Cl. 614, 620-24 (2002) (citing *Brown* and finding actual governmental exercise of control over Tribe's resources vests a full trust responsibility). Notwithstanding the lack of express statutory or regulatory delineation of duties (substantive source of fiduciary duties), in *White Mountain Apache*, that the government physically occupied and controlled the trust property "supports a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee." 537 U.S. at 475. "[E]lementary trust law confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." *Wopsock v. Natchees*, 454 F.3d 1327, 1332 (Fed. Cir. 2006) (citing *White Mountain*, 537 U.S. at 475).

Here, the statutes, regulations and lease provisions detailed above, and the actual control taken over approving, voiding, and re-approving the Lease as well as the litigation over the government's approval, implicate the same substantive sources construed in *Brown*. What is not so clear, and distinguishes the instant case from *Brown*, are questions concerning the level of "control" the government exerted in the various lawsuits, particularly over the Consent Judgment and the renegotiated Lease. *Cf. Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) (declining to find fiduciary duty in the Indian Self-Determination and Education Assistance Act ("ISDA")). Whether any fiduciary duty extends to the settlement of litigation, when

a Tribe is truly represented by independent counsel, and particularly when a Tribe independently attempts to repudiate its prior decisions, would be questionable. However, there are factual questions presented including the extent and context of legal representation, and the existence, quantum and causation of damages. On this record, this court cannot make a definitive jurisdictional determination that the pleadings do not state a cause of action.

In *Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322 (2005), the court rejected a variation of an argument the government makes here. The government argued the statute imposed only "'the specific duty on the United States to deposit royalties that are received.'" *Id.* at 327. The substantive statutory source stated "all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States." *Id.* at 325. Fiduciary obligations are not that circumspect.

> The court believes that this argument confuses the specific duty with the tasks that may be required to carry out that duty. The court agrees with the defendant that it has a specific duty to deposit royalties . . . as required by federal regulations and the terms of the lease. However, defendant does not simply stand as a teller behind a bank counter and accept whatever is placed before him by a depository. Defendant's duty is not discharged by mechanically crediting the account holder with whatever amounts are paid in. The plain language of the statute makes clear that defendant's duty is to hold in trust the moneys contractually owed. . . to the Tribe, . . . not merely whatever amount is deposited by the Tribes lessees. Defendant's duty necessarily includes verification that the royalty paid is the amount contractually owed under the terms of the lease.

*Id.* at 327-28. Defendant's duties included verifying the amounts due under the lease and the payment thereof.

*Osage* declined to limit the government's fiduciary obligation to that of a passive bank teller. Here, the situation is somewhat analogous. The statutorily required approval of the lease was not the entire extent of the government's duty.

That obligation extends to litigation brought by third parties about that approval. When by statute, regulation, lease and practice, the government controls the Lease, duties do not exist in a vacuum but extend here to litigation from third parties over the exercise of express fiduciary responsibilities. *Restatement (Second) of Trusts* § 178 (1959) ("The trustee is under a duty to the beneficiary to defend actions which may result in a loss to the trust estate, unless under all the circumstances it is unreasonable not to make such defense."); *see generally, In re Johnson*, 518 F.2d 246, 255 (10th Cir. 1975) ("a trustee who unsuccessfully defends charges of maladministration resulting in a surcharge is not entitled to be paid for his costs from the trust estate and may be required to pay the costs of the beneficiaries."). The government's position that Lease approval, the exercise of a statutory and regulatory requirement, is insulated from liability because of its genesis, lacks validity.

Fiduciary duties over leasing of tribal lands would ring hollow if attendant responsibilities did not include litigation over the government's approval of that lease. While the United States does not have a fiduciary obligation to prevent the Tribe from being exposed to litigation *per se*, litigation concerning the government's express statutory and regulatory obligation to approve leases by third parties, alleging improprieties or deficiencies in that approval, arises directly from the requisite substantive source from which compensation for breach could be reasonably inferred, and it "could fairly be interpreted as mandating compensation through money damages if the Government faltered in its responsibilities." *White Mountain Apache*, 537 U.S. at 474 (internal citation to *Mitchell II* omitted). Accordingly, the standard for a motion to dismiss or motion for judgment on the pleadings has not been met. It cannot be ruled that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Scheuer v. Rhodes*, 416 U.S. at 236-37 (1974). It is not clear that no relief could be granted under any set of facts that could be proven consistent with the allegations made. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Nevertheless, the court is mindful of the government's contention that any damage to plaintiff in connection with the recent litigation ending with the Consent Judgment was caused not by the government's breach of trust or fiduciary duty, but by plaintiff's decision to take the position that the lease was invalid, realigning itself from prior positions. That is, however, a matter of proof which awaits further development. It cannot be said on this record, that plaintiff does not state a facially

viable cause of action for breach of fiduciary duty in connection with the conduct and settlement of that litigation and renegotiation of the Land Lease.

As the Court in *Mitchell I*, after finding no substantive source of duty that would lead to compensation, allowed the Tribe to search for alternative sources for the trust obligations it advances, so further examination is appropriate here.

**Damages**

Although plaintiff asserts the existence of damages from breach of fiduciary duties, consisting of attorney fees and expenses, diminution in value of property and exposure to environmental mess upon termination of the Lease, defendant's motion did not specifically address damages. The issue was raised for the first time in defendant's Reply Brief. (Def.'s Reply 7.) As for the original lease, the only substantive damage claim plaintiff advances at this time is one for diminution in value of Tribal lands because of the asserted failure of the Land Lease to require a bond to protect the Tribe upon termination of the lease from damages to the land from the hog operation. However, as defendant points out, the renegotiated Lease in *Rosebud IV* has environmental controls and measures, including a waste management system closure plan with "a bond or other appropriate financial security to meet Sun Prairie's requirements under the Lease." (Marshall Aff. Ex. F 9-10.) It is not clear if that bonding requirement moots the damage alleged.

Additionally, however, the Tribe seeks attorney fees and costs from the district court *Rosebud* cases. Arguing litigation expenses are not recoverable, defendant cites *Franklin Federal Savings Bank v. United States*, 55 Fed. Cl. 108, 123 (2003), a *Winstar* case.[13/] ("The law is quite clear that statutory authorization is the *sine qua non* for recovery of legal costs arising from litigation against the Government."). While the Tribe did not respond to this argument, litigation expenses, including attorney fees in collateral litigation may be recoverable. *Terteling v. United States*, 167 Ct. Cl. 331, 338, 334 F.2d 250, 254 (1964). Also, in *Franklin Federal*, while attorneys fees incurred in that case were not recoverable, recovery included legal fees

---

[13/] *United States v. Winstar*, 518 U.S. 839 (1996) held the passage of the Financial Institution Reform Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183), and its implementing regulations constricting use of regulatory goodwill, breached contracts between the government and purchasers of troubled thrifts that granted favorable treatment.

for regulatory advice and preparation of filings of post-FIRREA capital plans. Accordingly, attorneys fees from prior *Rosebud* litigation are not totally foreclosed as a matter of law at this stage of the case *sub judice*. *See Shoshone Indian Tribe*, 58 Fed. Cl. 77, 86-91 (2003) (addressing claims the government failed to maximize coal royalties on Tribal lands, including in connection with the settlement of litigation with an oil and gas company and denying the government's motion for summary judgment in that regard). Contrary to the government's argument, recovery of damages measured by attorney fees and costs, as alleged here, would not require a separate waiver of sovereign immunity.

## CONCLUSION

Accordingly, it is **ORDERED**:

(1) Defendant's Motion for Judgment on the Pleadings is **GRANTED** as to any causes of action for breach of fiduciary duty that accrued six years prior to the date of the filing of the Complaint in this matter, and otherwise is **DENIED**.

(2) As part of the initial disclosures required by RCFC 26(a)(1) in this case, plaintiff shall promptly provide defendant a document identifying each specific claim of breach of fiduciary duty, the time frame of such, and the legal theories and factual basis therefore, along with the corresponding itemized damage with reference to books and records by which the items can be verified. *See* RCFC Appendix A ¶ 3(c).

(3) Counsel shall confer and on or before **February 9, 2007**, file a status report(s) indicating proceedings proposed for the final resolution of this litigation and a proposed schedule for the matters required to be accomplished. *See* RCFC 16(b) and Appendix A ¶ 8.

s/ James F. Merow
James F. Merow
Senior Judge